(No. 98641.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RICKY A. PATTERSON, Appellant.

*Opinion filed December 15, 2005.*

Thomas C. Brandstrader and Jodi L. Garvey, both of Chicago, for appellant.

Lisa Madigan, Attorney General, of Springfield, and John C. Piland, State's Attorney, of Urbana (Gary Feinerman, Solicitor General, and Linda D. Woloshin and Claire E. Labbé, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial in the circuit court of Cham-

paign County, defendant Ricky A. Patterson was convicted of first degree murder (720 ILCS 5/9—1(a)(1) (West 2002)), concealment of a homicidal death (720 ILCS 5/9—3.1(a) (2002)), and arson (720 ILCS 5/20—1(a) (West 2002)). Defendant was sentenced to 55 years in prison. On appeal, defendant argued, *inter alia*, that the circuit court erred in admitting the grand jury testimony of Migdalia Rivera, who declined to testify at trial. The appellate court held that, under *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), the admission of Rivera's grand jury testimony violated defendant's sixth amendment right to be confronted with the witnesses against him (U.S. Const., amend. VI). 347 Ill. App. 3d 1044, 1051. The appellate court concluded, however, that this error was harmless beyond a reasonable doubt. Defendant's conviction and sentence were affirmed. 347 Ill. App. 3d at 1056. We allowed defendant's petition for leave to appeal (177 Ill. 2d R. 315). We affirm the judgment of the appellate court.

## BACKGROUND

In October 2002 defendant was charged with first degree murder in the death of Derrick Prout, with whom defendant had met on June 17, 2002, for a drug transaction. Defendant also was charged with arson in the burning of defendant's rented residence in rural Champaign. In addition, defendant was charged with concealment of a homicidal death. According to the State's theory of the case, Prout was killed at defendant's residence, and defendant thereafter removed Prout's body from the residence to a remote location and set fire to the residence to conceal evidence of the killing.

In June 2002 when the offenses were committed, defendant was living in a rented house on the outskirts of Champaign with his girlfriend, Migdalia Rivera, and their young daughter. The $900 monthly rent had not been paid for four months. As of June 17, the date of the

victim's disappearance, defendant still lived in the house but had told his landlord that he would be moving in a few days.

Prout, who lived in Indianapolis in June 2002, drove to Champaign the night of June 16. At about 4 p.m. on Monday, June 17, Prout visited his girlfriend, Candice Johnson, who lived in an apartment in Champaign. Prout brought with him a duffel bag containing cannabis. At about 8 p.m. on June 17, defendant came to Johnson's apartment and spoke briefly with Prout. According to Johnson, Prout then took the bag of cannabis and left in his Dodge Intrepid, and defendant followed in his Blazer. Johnson called Prout later in the evening on his cell phone but there was no answer. Prout was missing for the next five days. His body was found on June 22 in Lake County, near Chicago.

According to defendant, on June 17 he and Prout left Johnson's apartment in separate vehicles and drove to a nearby car wash where they conducted a drug transaction. Defendant testified that Prout gave him 30 pounds of cannabis and defendant paid Prout $16,000. Defendant asserted that Prout then left in his Dodge Intrepid and defendant stayed and washed his own vehicle. Defendant stated that, at that point, he went back to his residence, and went to bed at about 10:30 or 11 p.m. According to defendant, the next evening (June 18) he and Rivera and their daughter left Champaign at 8 or 8:30 p.m. and drove to Chicago, where defendant was due in court at 9 a.m. on Wednesday, June 19. Defendant testified that they stayed the night of June 18 at the Rand Motel near the Chicago suburb of Palatine, arriving at the motel at about 10:30 or 10:45 p.m. Defendant added that, prior to arriving at the motel, he stopped in Schaumburg, which is south of Palatine, and sold eight pounds of cannabis to a man named Chris Smith. Defendant stated that the next morning, June 19, his car would not start, and he

was therefore late for his court date. The court appearance was rescheduled for the next day, June 20, and defendant stated that he and Rivera and their daughter began driving back to Champaign. Defendant testified that, while they were en route, he received a telephone call from his brother saying that defendant's residence had burned. This call was received on the couple's cell phone, which defendant acknowledged at trial was registered to Rivera. According to defendant, he and Rivera and their daughter arrived in Champaign at about 6:30 or 7 p.m. on June 19, went to their residence to survey the damage, and stayed the night at defendant's parents' home in Champaign. Defendant stated that the next morning he and Rivera and their daughter returned to Chicago for the rescheduled court date. Defendant testified that the next evening, June 21, he and Rivera and their daughter drove to St. Louis, arriving at about 10:15 or 10:30 p.m. The next day, June 22, defendant and Rivera were arrested by police in St. Louis.

The fire at defendant's residence in Champaign was discovered at about 3:20 a.m. on June 19. After the fire was suppressed, authorities looked in the living room and found two plastic containers with an odor similar to gasoline. An investigator for the Illinois fire marshal concluded that the fire was intentionally set. That evening, at about 7:30 p.m., an investigator for the Champaign County sheriff's office spoke to defendant in the yard of the residence. Defendant was asked his whereabouts at the time of the fire. Defendant told the investigator he had left Champaign about 8 p.m. the previous night, June 18, and had gone to Chicago. Defendant also told the investigator that he first learned of the fire the next afternoon, June 19, while he was en route from Chicago to Champaign.

On Saturday, June 22, 2002, five days after Prout's disappearance, authorities were alerted to a car fire in a

rural area of Lake County, near Chicago. The fire was discovered at about 8:50 a.m. The automobile, a Dodge Intrepid, was registered to the victim, Derrick Prout. After the fire was suppressed, officials looked in the trunk and found Prout's charred body. It was wrapped in a blanket with a "whitish background" and a "bluish print." An autopsy revealed that the burns on Prout's body occurred postmortem, and he had been dead "for some time." The victim had been stabbed eight times and shot twice. The coroner's physician who performed the autopsy concluded that Prout died of "multiple stab wounds with multiple gunshot wounds contributing to his death."

Lake County authorities contacted the police in St. Louis and directed them to pick up defendant and Rivera, who were in St. Louis at the time. Early the next morning, June 23, Lake County sheriff's detectives interviewed defendant at a police station in St. Louis. After being advised of his *Miranda* rights, defendant told the detectives: "I guess I'll answer some of your questions." Defendant told the detectives that he did not own a cellular telephone. He refused to provide them with Rivera's telephone number. The detectives questioned defendant as to his whereabouts in the early morning of June 19, the time of the fire at defendant's residence in Champaign. Defendant gave essentially the same explanation he had given to the Champaign County sheriff's police the evening of June 19. Defendant told the detectives that he had left Champaign at 9:30 or 10 p.m. the night before the fire, June 18, and drove to Chicago for a court date the next morning. Defendant declined to state specifically where in Chicago he stayed that night, but he "ma[d]e it clear" that he was not in Champaign at the time of the fire at his residence. Defendant told the detectives he learned of the fire the next day when a family member called him in Chicago. Following the questioning

by Lake County detectives, defendant and Rivera were released and they drove back to Champaign.

The next day, June 24, authorities in Champaign County executed a search warrant at defendant's burned residence. Under the terms of the warrant, investigators were authorized to seize "any and all items of physical evidence related to the commission of the offense[ ] of Murder, including but not limited to *** bodily fluids, including blood; weapons; cutting instruments; *** any items indicating the presence of Derrick A. Prout [in the residence]; and photographs of the above-described items, and the residents." Pursuant to this warrant, a number of items were recovered from defendant's residence, including a section of the living room carpet with a large, "reddish brownish" stain that tested positive for blood. Investigators said the carpet had a strong odor of cleaning solution such as Pine-Sol. In the padding underneath they found what appeared to be "soap suds." Other items recovered from the residence included an empty Pine-Sol bottle, an empty Clorox bottle, a plastic bucket, a spray bottle of Clorox cleaner, and a film canister with a roll of film inside.

Kelly Gannon, the State's expert on deoxyribonucleic acid (DNA), testified that, based on her analysis of the human DNA in the carpet sample from defendant's living room, the blood found on the carpet matched that of the victim, Derrick Prout. According to Gannon, the probability that the DNA profile found in the carpet would appear again in the general population was one in 38.3 quadrillion for Caucasians, one in 16.3 quadrillion for African Americans, and one in 51.9 quadrillion for Hispanics.

The roll of film in the film canister that was recovered from defendant's residence was developed, and the prints were forwarded to George Boise, an investigator with the Champaign County sheriff's office. At trial, Boise identi-

fied and described three of those photographs. One showed defendant with a small child on a couch. Defendant and the child were wrapped in a "whitish" blanket with a "fairly distinct" blue pattern. A second photo showed Rivera with the same child, wrapped in the same blanket. A third photo, a close-up of the same child, apparently being held by Rivera, showed the same blanket.

Charles Ogle, a detective with the Champaign County sheriff's office, also testified regarding these photos. According to Ogle, the blanket shown in the photos of defendant and Rivera appeared to be the same as the blanket that was recovered from the trunk of the car where Prout's body was found.

On September 10, 2002, Champaign County authorities arrested defendant for the murder of Prout. On October 3, 2002, defendant was indicted by a Champaign County grand jury on charges of first degree murder, arson, and concealment of a homicidal death.

At defendant's trial, which took place in April 2003, the State attempted to call Rivera as a witness. Out of the presence of the jury, Rivera acknowledged that she had been subpoenaed to testify as a witness in the case at bar, and acknowledged that she had testified before a Champaign County grand jury on January 16, 2003. However, Rivera then invoked her right under the fifth amendment of the United States Constitution not to answer questions. The State argued that, pursuant to section 115—10.2 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—10.2 (West 2002)), Rivera was unavailable to testify, and the State therefore asked that Rivera's grand jury testimony be read to the jury. Section 115—10.2 provides that, where a witness refuses to testify despite a court order to do so, prior statements of the witness may be admissible under certain circumstances. The circuit court agreed with the State that Rivera was unavailable to testify within the meaning of

section 115—10.2. Over defendant's objection, the court allowed Rivera's grand jury testimony to be read to the jury.

In her grand jury testimony, Rivera gave essentially the same account as did defendant regarding their June 18-19 and June 20 trips to Chicago for defendant's court appearance. Rivera's testimony also agreed with defendant's as to the couple's June 21-22 trip to St. Louis.

Rivera testified in addition about the couple's cell phone, which was registered to Rivera. She told the grand jury that the cell phone was their only telephone, and it was defendant who usually carried it. They had no land line. Rivera also stated that, to the best of her knowledge, she and defendant were the only ones who had access to the cell phone between June 17 and June 21, 2002.

Rivera's grand jury testimony about the cell phone differed from defendant's testimony at trial. Under cross-examination, defendant conceded that Rivera's cell phone was usually in either his or Rivera's possession. However, defendant testified that neither he nor Rivera had possession of the cell phone for about 24 hours between June 18 and 19 (the period during which defendant's residence in Champaign was burned). According to defendant, he met with Chris Smith in Champaign at about 3 or 3:30 p.m. on June 18, and accidentally left the cell phone in Smith's car. Defendant acknowledged that Chris Smith was the same person to whom he sold cannabis later that night in Schaumburg, near Chicago. Defendant stated that Smith returned the cell phone to him at about 2:30 p.m. the next day, June 19, as defendant was leaving court in Chicago. When asked why he did not simply retrieve the cell phone from Smith the night of June 18, when he met him in Schaumburg, defendant answered: "Didn't really cross my mind." When counsel pressed defendant further, reminding him that this cell phone was his only telephone, defendant responded that he had

another cell phone. This contradicted defendant's earlier statement to Lake County sheriff's detectives on June 23, 2002, that he did not own a cellular telephone. It also contradicted Rivera's grand jury testimony that her cell phone was the couple's only telephone.

The State presented evidence at trial that contradicted defendant's testimony regarding the cell phone. Monique Adams, Prout's sister, testified that she learned on Tuesday, June 18, 2002, that her brother might be missing. Adams stated that she contacted defendant by telephone that evening and asked him about any information he might have regarding her brother. Adams contacted defendant by calling the number of Rivera's cell phone. According to Adams, this telephone conversation with defendant took place at about 8 p.m. on June 18. This contradicted defendant's claim that it was Chris Smith, not defendant, who had possession of Rivera's cell phone from 3:30 p.m. June 18 to 2:30 p.m. June 19. The State also introduced records for Rivera's cell phone showing that, during the period when the phone allegedly was in Smith's possession, calls were made from this phone to defendant's brother and defendant's mother.

During defendant's direct examination at trial, defendant denied that Prout had ever been in his home in Champaign. Defendant also denied stabbing or shooting Prout, or putting Prout's body in the trunk of Prout's Dodge Intrepid and setting the vehicle on fire. On cross-examination, defendant denied setting fire to his home in Champaign.

During deliberations, the jury sent a note to the judge asking for a copy of Rivera's grand jury testimony. After conferring with the parties, the judge sent a response to the jury stating: "You will not receive a copy of, or transcript of the Migdalia Rivera testimony. You should rely on your collective recollection of the testimony presented to you at trial."

On April 23, 2003, the jury found defendant guilty of first degree murder, arson, and concealment of a homicidal death. On May 29, 2003, following a sentencing hearing, the circuit court sentenced defendant to 50 years in prison for first degree murder; 5 years' imprisonment for concealment of a homicidal death, to run consecutively with the sentence for murder; and 5 years' imprisonment for arson, to run concurrently with the other two sentences imposed.

Defendant filed a posttrial motion arguing that: (1) the evidence presented was insufficient to prove him guilty beyond a reasonable doubt, and (2) the admission of Rivera's grand jury testimony, without any opportunity for cross-examination, violated defendant's constitutional right to be confronted with the witnesses against him. During the hearing on the posttrial motion, defense counsel argued that Rivera's grand jury testimony, particularly her testimony about the couple's cell phone, had impacted defendant's decision on whether to testify at trial. Counsel stated: "[T]he Defendant was placed in a similarly impossible situation, Judge, having to elect to take the stand and testify in his own behalf to rebut testimony that was allowed in through the Grand Jury testimony of Migdalia Rivera." Defendant's posttrial motion was denied.

Defendant filed a motion to reconsider sentence, arguing that his sentence was excessive. That motion also was denied.

On appeal, defendant argued, as he had in his posttrial motion and his motion to reduce sentence, that: (1) the circuit court's admission of Rivera's grand jury testimony violated the sixth amendment's confrontation clause (U.S. Const., amend. VI); (2) the evidence presented at trial was insufficient to prove defendant guilty beyond a reasonable doubt; and (3) defendant's sentence was excessive. Defendant also raised additional argu-

ments of ineffective assistance of counsel and prosecutorial misconduct. Defendant contended that his counsel was ineffective for: (1) failing to file a motion to suppress photographs obtained from the roll of film seized at defendant's residence; and (2) failing to challenge effectively the State's DNA evidence. With regard to prosecutorial misconduct, defendant argued that the State violated his right to a fair trial by: (1) eliciting testimony about defendant's refusal to answer certain questions when he was interviewed by authorities in St. Louis; and (2) eliciting testimony from the State's DNA expert that the DNA evidence was available for retesting by defendant, but he did not ask that it be retested.

With regard to defendant's confrontation clause argument, the appellate court held that the admission of Rivera's grand jury testimony violated the confrontation clause. In reaching this decision, the appellate court looked to *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), which was decided subsequent to briefing in the appellate court. The appellate court noted that, prior to *Crawford*, the admissibility of prior witness statements such as Rivera's grand jury testimony was governed by section 115—10.2 of the Code of Criminal Procedure (725 ILCS 5/115—10.2 (West 2002)). Under section 115—10.2, previous hearsay statements of a witness who refused to testify were admissible, even where the defendant had no prior opportunity to cross-examine the witness, so long as the statements met certain requirements. 725 ILCS 5/115—10.2(a) (West 2002). However, the appellate court concluded that, in light of *Crawford*, section 115—10.2 "can no longer be said to incorporate the relevant constitutional standard" for admitting prior hearsay statements of a non-testifying witness. 347 Ill. App. 3d at 1050. Under *Crawford*, the appellate court observed, such statements are admissible "only where the defendant had a prior opportunity for

cross-examination." 347 Ill. App. 3d at 1050. In the case at bar, where Rivera's grand jury testimony was admitted but she declined to testify, "defendant had no opportunity to cross-examine her." 347 Ill. App. 3d at 1051. The appellate court held that, under *Crawford*, "the State's use of [Rivera's grand jury] testimony therefore violated the confrontation clause." 347 Ill. App. 3d at 1051. The court concluded, however, that the circuit court's error in allowing Rivera's grand jury testimony was harmless beyond a reasonable doubt.

The appellate court rejected defendant's remaining arguments, and affirmed his convictions and sentence. We allowed defendant's petition for leave to appeal (177 Ill. 2d R. 315), and we now affirm the judgment of the appellate court.

## ANALYSIS

Before this court, defendant makes essentially the same arguments that he did in the appellate court below. Defendant argues that: (1) the admission of Rivera's grand jury testimony violated defendant's constitutional right to be confronted with the witnesses against him; (2) his trial counsel was ineffective (a) for failing to file a motion to suppress the photographs obtained from the undeveloped film that was seized at defendant's residence, and (b) for failing to challenge effectively the State's DNA evidence; (3) the State violated his right to a fair trial by (a) eliciting testimony about defendant's refusal to answer certain questions when he was interviewed by authorities in St. Louis, and (b) eliciting testimony from the State's DNA expert that the DNA evidence was available for retesting by defendant, but he did not ask that it be retested; (4) the evidence of defendant's guilt was insufficient to sustain his conviction; and (5) defendant's sentence was excessive.

### A. Rivera's Grand Jury Testimony

The sixth amendment's confrontation clause, which

applies to both federal and state prosecutions (*Crawford*, 541 U.S. at 42, 158 L. Ed. 2d at 187, 124 S. Ct. at 1359), provides: "In all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him ***." U.S. Const., amend. VI. In *Crawford*, the Supreme Court reinterpreted the confrontation clause and held that the testimonial hearsay statements of a witness who is unavailable at trial may not be admitted against a criminal defendant unless the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. While the Court in *Crawford* declined to spell out a comprehensive definition of "testimonial," it nevertheless noted: "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, *before a grand jury*, or at a former trial; and to police interrogations." (Emphasis added.) *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203, 124 S. Ct. at 1374. In the case at bar, Rivera's testimony was given before a grand jury, and defendant had no opportunity to cross-examine her. Under *Crawford*, the admission of this testimony violated the confrontation clause.

The question before us is whether a *Crawford* violation is subject to harmless-error review. Defendant answers this question in the negative. According to defendant, "the constitutional violation in this case is so substantial, and the right to confront the witnesses against him so fundamental, that a harmless error analysis is simply inappropriate." We disagree.

In *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), the Supreme Court adopted the general rule that a constitutional error does not automatically require reversal of a conviction. *Arizona v. Fulminante*, 499 U.S. 279, 306, 113 L. Ed. 2d 302, 329, 111 S. Ct. 1246, 1263 (1991). Since *Chapman*, "the Court has applied harmless-error analysis to a wide range of errors

and has recognized that most constitutional errors can be harmless." *Fulminante*, 499 U.S. at 306, 113 L. Ed. 2d at 329, 111 S. Ct. at 1263. The Court has acknowledged that there are some constitutional errors, such as trial before a judge who is financially interested, or the total deprivation of the right to counsel at trial, which are not subject to harmless-error review.

> "These are structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards. The entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant, just as it is by the presence on the bench of a judge who is not impartial." *Fulminante*, 499 U.S. at 309-10, 113 L. Ed. 2d at 331, 111 S. Ct. at 1265.

However, most constitutional errors are not structural defects. Rather, they are "trial errors," which the Court defines as "error[s] which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 307-08, 113 L. Ed. 2d at 330, 111 S. Ct. at 1264. Examples of such trial errors include, *e.g.*, a jury instruction that misstates an element of an offense; the restriction of a defendant's right to cross-examine a witness for bias, in violation of the sixth amendment's confrontation clause; and the denial of a defendant's right to be present at trial. *Fulminante*, 499 U.S. at 306-07, 113 L. Ed. 2d at 329-30, 111 S. Ct. at 1263 (collecting cases).

Confrontation clause violations such as the one that occurred in the case at bar are not "structural defects in the constitution of the trial mechanism" that affect "[t]he entire conduct of the trial from beginning to end." *Fulminante*, 499 U.S. at 309, 113 L. Ed. 2d at 331, 111 S. Ct. at 1265. Rather, the violation at issue here—the improper admission of Rivera's grand jury testimony—is

more accurately described as a "trial error," *i.e.*, an "error which occurred during the presentation of the case to the jury." *Fulminante*, 499 U.S. at 307-08, 113 L. Ed. 2d at 330, 111 S. Ct. at 1264.

Prior to the decision in *Crawford*, it was well settled that confrontation clause violations were subject to harmless-error analysis. In *Harrington v. California*, 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726 (1969), the Supreme Court "expressly rejected the claim that the admission into evidence of a statement made by a non-testifying codefendant *** can never be harmless." *Delaware v. Van Arsdall*, 475 U.S. 673, 682, 89 L. Ed. 2d 674, 685, 106 S. Ct. 1431, 1437 (1986), citing *Harrington*, 395 U.S. at 254, 23 L. Ed. 2d at 288, 89 S. Ct. at 1728. According to *Van Arsdall*, the decision in *Harrington* "demonstrates that the denial of the opportunity to cross-examine an adverse witness does not fit within the limited category of constitutional errors that are deemed prejudicial in every case." *Van Arsdall*, 475 U.S. at 682, 89 L. Ed. 2d at 685, 106 S. Ct. at 1437.

Defendant in the case at bar argues, however, that, as a result of the decision in *Crawford*, it is no longer appropriate to apply harmless-error review to violations of the confrontation clause. We do not agree.

The Supreme Court in *Crawford* declined to address whether harmless-error analysis could be applied to a *Crawford* violation. *Crawford*, 541 U.S. at 42 n.1, 158 L. Ed. 2d at 187 n.1, 124 S. Ct. at 1359 n.1. However, in his concurring opinion in *Crawford*, Chief Justice Rehnquist suggested that such analysis would be appropriate. "Likewise to the Court's credit is its implicit recognition that the mistaken application of its new rule by courts which guess wrong as to the scope of the rule is subject to harmless-error analysis." *Crawford*, 541 U.S. at 76, 158 L. Ed. 2d at 208, 124 S. Ct. at 1378 (Rehnquist, C.J., concurring, joined by O'Connor, J.).

Since March 2004, when *Crawford* was decided, a number of courts have addressed *Crawford* violations. In *People v. Thompson*, 349 Ill. App. 3d 587 (2004), a domestic battery case, the written statements of the victim, made in the course of obtaining an order of protection, were admitted in the defendant's trial. The defendant had no prior opportunity for cross-examination. The appellate court in *Thompson* held that, under *Crawford*, the admission of the victim's statements violated the confrontation clause. The appellate court then applied harmless-error analysis to determine whether the *Crawford* error was harmless beyond a reasonable doubt. The court answered this question in the negative.

Other courts that have confronted *Crawford* violations have also applied harmless-error review. They include, *e.g.*, *New Mexico v. Alvarez-Lopez*, 136 N.M. 309, 98 P.3d 699 (2004); *Vigil v. Wyoming*, 98 P.3d 172 (Wyo. 2004); *United States v. Rodriguez-Marrero*, 390 F.3d 1 (1st Cir. 2004); *United States v. Gilbert*, 391 F.3d 882 (7th Cir. 2004); *Guidry v. Dretke*, 397 F.3d 306 (5th Cir. 2005).

Notwithstanding the foregoing, defendant argues that, since *Crawford* was decided, "courts have questioned whether a harmless error analysis is appropriate" in addressing *Crawford* violations. Defendant points to *Minnesota v. Courtney*, 682 N.W.2d 185 (Minn. App. 2004), *rev'd on other grounds*, 696 N.W.2d 73 (Minn. 2005), a domestic assault case in which the defendant was convicted of assaulting his former girlfriend. At the defendant's trial, a videotaped interview between the victim's six-year-old daughter and a child-protection worker was played for the jury. The child did not testify at trial, and the defendant had no prior opportunity for cross-examination. The Minnesota court of appeals held that, under *Crawford*, the admission of the child's videotaped interview violated the defendant's sixth

amendment right to confrontation. The court noted that *Crawford* declined to address whether harmless-error analysis could be applied to *Crawford* violations. However, the court asserted that, even if such analysis did apply, the error at issue was not harmless. The court stated: "[G]iven the circumstances in this case and the Supreme Court's emphasis on a criminal defendant's right to confrontation, the error was not harmless, *if even a harmless error analysis can be reached by the state*." (Emphasis added.) *Courtney*, 682 N.W.2d at 197.[1]

Defendant's reliance on *Courtney* is unavailing. Even if we assume that the emphasized portion of the statement quoted above is not *obiter dictum*, it still amounts to only a questioning of whether harmless-error analysis applies to *Crawford* violations. It does not (nor could it) constitute an overturning of the rule that confrontation clause violations are subject to harmless-error review.

What defendant is arguing, in essence, is that *Crawford* implicitly overruled *Harrington*, *Van Arsdall*, and any other Supreme Court decision holding that confrontation clause violations are subject to harmless-error review. *Crawford* does not explicitly overrule these decisions, and we may not assume an implicit overruling of a previous Supreme Court decision. *Agostini v. Felton*, 521 U.S. 203, 237, 138 L. Ed. 2d 391, 423, 117 S. Ct. 1997, 2017 (1997) (reaffirming rule that it is the prerogative of the Supreme Court to overrule its own decisions). In view of the well-established rule, pre-*Crawford*, that confrontation clause violations were subject to harmless-

---

[1]The Minnesota Supreme Court overruled the appellate court judgment in *Courtney*, but the Supreme Court decision did not affect the appellate court's questioning of whether harmless-error analysis applied to *Crawford* violations. *Minnesota v. Courtney*, 696 N.W.2d 73 (Minn. 2005). The Supreme Court declined to decide whether there was a confrontation clause violation, holding instead that any error in admitting the videotaped interview was harmless beyond a reasonable doubt.

error analysis, and the numerous post-*Crawford* decisions applying harmless-error review to *Crawford* violations, as well as the Supreme Court's admonition not to assume the implicit overruling of a Supreme Court decision, we conclude that *Crawford* violations are subject to harmless-error analysis.

We turn now to the question of whether the confrontation clause violation in the case at bar was harmless beyond a reasonable doubt. In determining whether a constitutional error is harmless, the test to be applied is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 124 L. Ed. 2d 182, 189, 113 S. Ct. 2078, 2081 (1993); *Satterwhite v. Texas*, 486 U.S. 249, 258-59, 100 L. Ed. 2d 284, 295, 108 S. Ct. 1792, 1798 (1988); *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 828 (1967). The State bears the burden of proof. *Sullivan*, 508 U.S. at 278-79, 124 L. Ed. 2d at 189, 113 S. Ct. at 2081; *Brecht v. Abrahamson*, 507 U.S. 619, 630, 123 L. Ed. 2d 353, 368, 113 S. Ct. 1710, 1717 (1993); *Satterwhite*, 486 U.S. at 258, 100 L. Ed. 2d at 295, 108 S. Ct. at 1798. In *People v. Wilkerson*, 87 Ill. 2d 151 (1981), this court listed three different approaches for measuring error under this harmless-constitutional-error test: (1) focusing on the error to determine whether it might have contributed to the conviction, (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction, and (3) determining whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. *Wilkerson*, 87 Ill. 2d at 157. See also *People v. Collins*, 85 Ill. App. 3d 1056, 1060 (1980).

Before applying these approaches to the case at bar, we first address defendant's argument that the admission of Rivera's grand jury testimony "all but forced"

defendant to testify at trial. According to defendant, the State introduced Rivera's grand jury testimony in order to "impute a false alibi" to defendant, which the State was then able to refute with cell-phone records. The "false alibi" to which defendant refers is that he was in Chicago at the time when his residence was set afire and therefore could not have committed the arson. Defendant maintains that he never asserted this alibi, and that once it had been presented through Rivera's testimony and refuted by the State, defendant had little choice but to testify in his own behalf to attempt to answer it. Defendant states: "[H]ad Rivera's grand jury testimony not been admitted, [defendant] would not have been compelled to testify."

If we accepted this argument as fact, it would call into question the admissibility of defendant's trial testimony, which would have been induced by the erroneously admitted grand jury testimony of Rivera. However, we do not accept defendant's argument as fact.

First, we question the accuracy of defendant's assertion that the alibi came in only through Rivera's testimony. The record shows that defendant himself claimed, on at least two occasions, that he was in Chicago during the period (early morning on June 19) when the arson at his residence in Champaign took place. At about 7:30 p.m. on June 19, a Champaign County sheriff's investigator spoke to defendant in the yard of the residence. Defendant was asked his whereabouts at the time of the fire, and defendant answered that he was in Chicago, where he had gone the night before, June 18. Defendant told the investigator that he learned of the fire the afternoon of June 19, while he was en route from Chicago to Champaign. Defendant stated that a family member called him by cell phone. Four days later, when defendant was interviewed in St. Louis by Lake County detectives, defendant gave the detectives essentially the same ac-

count as to his whereabouts at the time of the fire. Defendant told the detectives he was in Chicago.

Notwithstanding the foregoing, our rejection of defendant's forced-to-testify argument is based on reasons *other than* the discrepancy between defendant's claim that he never asserted the alibi and the account he gave to Champaign County and Lake County authorities. The record before us contains neither testimony nor documentary evidence establishing that defendant's decision to testify at trial was motivated by Rivera's grand jury testimony. Lacking some sort of factual basis for concluding that defendant was forced to testify in his own behalf, we can only speculate as to the reason for defendant's decision. We decline defendant's invitation to engage in such speculation.

We now turn to an analysis of whether the admission of Rivera's grand jury testimony was harmless beyond a reasonable doubt. Much of Rivera's testimony dealt with defendant and Rivera's trips together on June 18-19 and June 20 to Chicago for defendant's court appearance, as well as their trip together to St. Louis on June 21-22. Rivera's account of these trips agreed with defendant's account. For example, Rivera testified that she and defendant and their child left Champaign at about 8 or 9 p.m. on January 18, the night before the fire at their residence, and drove to Chicago for defendant's court date the next morning, June 19. Rivera stated that they left Chicago the afternoon of June 19 to drive back to Champaign. While they were en route, Rivera testified, they received a telephone call from defendant's brother notifying them of the fire at their residence in Champaign. Rivera stated that this call was received on their cell phone. This account of the June 18-19 trip is essentially the same as what defendant told the Champaign County sheriff's investigator the night of June 19 and the Lake County detectives the morning of June 23 in St. Louis.

Rivera's grand jury testimony also indicated that the couple's cell phone, which she stated was their only telephone, was in their possession during the trips to Chicago. Rivera stated that, to the best of her knowledge, no one other than she and defendant had access to the cell phone between Monday, June 17, and Friday, June 21. This includes the period (3:30 p.m. June 18 to 2:30 p.m. June 19) when, according to defendant's testimony at trial, Rivera's cell phone was in the possession of Chris Smith, not Rivera and defendant.

Rivera testified further that she had never met the victim, Derrick Prout, and he was never in their home. Rivera also identified a blanket shown in a photo of defendant and their child as their blanket. Rivera stated that the blanket was a gift. When shown a photo of the blanket in which the victim's body was found wrapped, Rivera agreed that it appeared to be the same as the blanket in the photo of defendant and their daughter.

Rivera's testimony that the couple's cell phone was in their possession during the trips to Chicago contradicted defendant's testimony that the phone was not in their possession between 3:30 p.m. June 18 and 2:30 p.m. June 19. However, Rivera's grand jury testimony was not the only evidence contradicting defendant on this point. Monique Adams, the victim's sister, testified that she contacted defendant by telephone at about 8 p.m. June 18 and asked him about any information he might have regarding her missing brother. Adams reached defendant by calling the number of Rivera's cell phone. Adams' testimony is at odds with defendant's claim that Rivera's cell phone was, at that time, in the possession of Chris Smith, not defendant or Rivera.

Additional evidence, in the form of Rivera's cell-phone records, cast doubt on the claim that the cell phone was with Smith, not defendant. According to these records, on Tuesday evening, June 18, two calls were

placed from Rivera's cell phone in the Champaign-Urbana area to defendant's brother. These calls were placed at 7:45 p.m. and 7:53 p.m., more than four hours after 3:30 p.m., the time when the phone allegedly was left with Smith. The next morning, June 19, two calls were made from Rivera's phone in the Champaign-Urbana area to the Cook County courthouse in Chicago where defendant had a court date that morning. The calls to the courthouse were placed at 7:23 a.m. and 8:11 a.m., shortly before defendant's scheduled 9 a.m. court appearance. The next outgoing call from Rivera's phone, at 8:18 a.m., was made to defendant's mother.

Additional points in Rivera's grand jury testimony were established by other, properly admitted evidence. Rivera's assertion that the victim was never in their home was echoed by defendant, who said the same thing on direct examination at trial. Moreover, the similarity between the blanket in the photo of defendant and his child and the blanket found with the body of the victim was asserted in other evidence, as well. On direct examination at trial, Charles Ogle, a Champaign County sheriff's detective, was shown, *inter alia*, People's exhibit 2, a photo of defendant and his daughter with a blanket also visible, and People's exhibit 5, a photo of the blanket that was taken from the trunk of the car in which the victim's body was found. The following colloquy took place between the assistant State's Attorney and Ogle regarding the blankets shown in these photos.

"Q. Do those blankets appear to be substantially similar to you?

A. Yes, sir.

Q. Do you see similar background color in both of those blankets?

A. Yes, I do.

Q. Do you see similar marks in both of these blankets?

A. Yes.

Q. Do they contain one or more triangular shaped

objects, and I am pointing to Exhibit 5, triangles with squares, with circles in the center and circles at the corners?

A. Yes, sir.

Q. Pointing to [Exhibit] 2, does that image appear at one location in Exhibit 2?

A. Yes, sir.

Q. Is there also in Exhibit 5 a circle with a multipointed star in it, the area that I am pointing to?

A. Yes.

Q. I am pointing to Exhibit 2[.] [D]oes this same image reoccur [sic] in at least two places in Exhibit 2?

A. Yes, sir."

Defendant was shown the same two exhibits on cross-examination at trial. He acknowledged that he formerly owned a blanket similar to the one shown in exhibit 5, the photo of the blanket found with the victim. Defendant agreed that the blanket he owned was shown in exhibit 2, the photo of defendant and his daughter. Defendant stated, as did Rivera in her grand jury testimony, that the blanket was a gift.

We turn now to an examination of the evidence other than Rivera's grand jury testimony to determine if there was overwhelming evidence to support defendant's conviction. Defendant was the last person seen with the victim before he disappeared. Testimony at trial showed that defendant met with the victim on Monday, June 17, 2002, at the victim's girlfriend's apartment in Champaign. The two men left the apartment at about 8 p.m. in separate vehicles, one following the other, to engage in a drug transaction. Five days later, the victim's body was found in the trunk of his burned-out vehicle in Lake County near Chicago. Along with the body, authorities found a blanket that was similar to a blanket owned by defendant. Charles Ogle, a Champaign County sheriff's detective, was shown photographs of the blanket found with the victim and the blanket owned by defendant. Ogle testified in detail regarding the similarities between

them. After the victim's body was found, authorities in Champaign County searched defendant's residence, which had sustained serious damage several days earlier in an arson fire. In the living room of defendant's residence, authorities found a stain on the carpet that tested positive for blood. An analysis revealed that DNA from this stain matched that of the victim. However, defendant insisted at trial that the victim had never been in defendant's home.

As previously noted, the State also presented testimony and telephone records that contradicted defendant's claim that Rivera's cell phone was not in his or Rivera's possession for about a 24-hour period from 3:30 p.m. June 18 until 2:30 p.m. June 19. The State also introduced phone records showing that Rivera's cell phone was in the Champaign-Urbana area at least from the evening of June 17 until about noon on June 19. The arson fire at defendant's Champaign residence was reported at about 3:20 a.m. June 19, which was within this period. The records for Rivera's cell phone also showed that, by early afternoon on Wednesday, June 19, Rivera's cell phone was about an hour north of Champaign, and it kept moving along I-57 until it reached Chicago. Later in the afternoon, the phone began moving southward from Chicago toward Champaign. These records appeared to contradict defendant's claim that he and Rivera and their daughter drove to Chicago the evening of *Tuesday*, *June 18*.

In our view, the evidence in support of defendant's convictions is overwhelming. However, defendant challenges this evidence on the ground that it is circumstantial. Defendant notes, for example, that "there were no witnesses who testified to having seen [defendant] harm the victim in any way; no murder weapon was ever recovered; there was no evidence to suggest that [defendant] and the victim had anything but a very amicable

relationship." We acknowledge that not all of the evidence in this case was direct. However, this court has consistently held that a conviction may be based solely on circumstantial evidence. "A conviction can be sustained upon circumstantial evidence as well as upon direct, and to prove guilt beyond a reasonable doubt does not mean that the jury must disregard the inferences that flow normally from the evidence before it." *People v. Williams*, 40 Ill. 2d 522, 526 (1968); see also *People v. Locascio*, 106 Ill. 2d 529, 537 (1985); *People v. Huff*, 29 Ill. 2d 315, 320 (1963). We reject defendant's circumstantial evidence argument.

Defendant also notes that, during deliberations, the jury asked for a copy of Rivera's grand jury testimony. After consulting with counsel for the parties, the judge denied this request. Defendant argues that the fact that the jury requested a copy of Rivera's testimony "creates more than a reasonable probability that Rivera's improperly admitted testimony contributed to the guilty verdict." We disagree.

The jury's request for a copy of Rivera's testimony might suggest that the jury was curious about the testimony or that the jury had questions about it. However, the mere fact that the jury asked for a copy of the testimony does not create a reasonable probability, or even a reasonable possibility, that the jury relied on this testimony in reaching its verdict. To contend that it does is, in our view, speculative. Rather than engage in such speculation, we base our harmless-error decision on the analysis outlined in *Wilkerson* for assessing error under the harmless-constitutional-error test. We believe this is the better approach.

Defendant also points to cases where courts have refused to find a *Crawford* error harmless. An example is *People v. Thompson*, 349 Ill. App. 3d 587 (2004), a domestic battery case. At trial, the State introduced writ-

ten statements of the victim which were made in the course of obtaining an order of protection. These statements named the defendant as the attacker and described the attack in some detail. Also introduced at trial were inculpatory statements that were attributed to the defendant by police officers. However, the defendant denied these statements. The appellate court held that, under *Crawford*, the admission of the victim's written statements was a violation of the confrontation clause. The appellate court also found, after applying the analysis outlined in *Wilkerson*, that the error was not harmless. The court explained that the victim's statements were the only evidence, other than the inculpatory statements attributed to the defendant, which identified the defendant as the attacker. As noted, the defendant denied the inculpatory statements attributed to him by the police. The appellate court concluded: "There is a reasonable probability the admission of [the victim's] statements contributed to the conviction." *Thompson*, 349 Ill. App. 3d at 594-95.

*Thompson* is clearly distinguishable from the case at bar. In *Thompson*, the improperly admitted evidence consisted of statements by the victim identifying the defendant as her attacker and describing the attack. The only other evidence identifying the defendant as the attacker consisted of the inculpatory statements attributed to the defendant by police officers but denied by the defendant. The statements of a victim identifying her attacker and describing the attack are extremely powerful evidence of a defendant's guilt. It would be difficult to argue that such statements did not contribute to the jury's verdict.

Here, by contrast, the improperly admitted evidence did not identify defendant as the killer or the arsonist, nor did it describe the killing or the arson. Indeed, much of Rivera's grand jury testimony agreed with defendant's

account of where he was at the time of the arson. Rivera's testimony did conflict with defendant's account as to where the couple's cell phone was between June 18 and 19, but, as noted, this point was established by other, properly admitted evidence. In addition, while Rivera's testimony identified the blanket in the photo of defendant and their child as belonging to them, and agreed that there were similarities between that blanket and the one found with the victim's body, these points also were established by other evidence. Notably, a Champaign County sheriff's detective testified in detail as to the similarities between defendant's blanket and the one found with the victim.

Having carefully analyzed the evidence in the case at bar, we believe that the admission of Rivera's grand jury testimony was harmless beyond a reasonable doubt. Given the presence and strength of the other evidence establishing the points raised in Rivera's grand jury testimony, as well as the overwhelming nature of the evidence, other than Rivera's testimony, supporting defendant's convictions, we conclude that the State has proven beyond a reasonable doubt that the admission of Rivera's testimony did not contribute to the verdict obtained. See *Chapman*, 386 U.S. at 24, 17 L. Ed. 2d at 710, 87 S. Ct. at 828.

## B. Ineffective Assistance of Trial Counsel

### 1. *Failure to File a Motion to Suppress*

Defendant next argues that his trial counsel was ineffective for failing to file a motion to suppress the photographs obtained from the undeveloped film that was seized at defendant's residence. Defendant contends that the search warrant authorized the seizure of "photographs" and that undeveloped film does not constitute photographs. Defendant therefore argues that the film was improperly seized. Defendant contends, in

addition, that the police needed a separate warrant in order to develop the film into photographic prints.

In determining whether a defendant was denied the effective assistance of counsel, we apply the familiar two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). To prevail on an ineffective-assistance claim, a defendant must show that: (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant such that he was deprived of a fair trial. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. The failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

In order to establish prejudice resulting from failure to file a motion to suppress, a defendant must show a reasonable probability that: (1) the motion would have been granted, and (2) the outcome of the trial would have been different had the evidence been suppressed. *People v. Orange*, 168 Ill. 2d 138, 153 (1995). The failure to file a motion to suppress does not establish incompetent representation when the motion would have been futile. See *People v. Wilson*, 164 Ill. 2d 436, 454 (1994).

The first question is whether there is a reasonable probability that the circuit court would have granted a motion to suppress the photographs if counsel had filed such a motion. The warrant at issue authorized the seizure of

> "any and all items of physical evidence related to the commission of the offense[ ] of Murder including but not limited to: Fingerprints, hair, fiber, trace evidence, bodily fluids, including blood; weapons; cutting instruments; items which may be used as ligatures including but not limited to silver colored duct tape; indicia of occupancy or ownership of the above-described residence; insurance and financial records for the above-described property, its own-

ers or occupants; any items indicating the presence of Derrick A. Prout in the above-described property; and *photographs* of the above-described items, and the residents." (Emphasis added.)

The appellate court below held that the undeveloped film was the "functional equivalent" of photographs and thus fell within the scope of the warrant. "The warrant clearly authorized the seizure of photographs, and it is difficult to imagine any use for exposed but undeveloped film other than to develop it into photographs." 347 Ill. App. 3d at 1053. Defendant argues, to the contrary, that undeveloped film is not the functional equivalent of photographs because the police could not have known when they seized the film whether it contained photographs depicting items and persons that were within the scope of the warrant. Defendant contends that the undeveloped film taken from his residence was not within the scope of the warrant and therefore should not have been seized. Defendant's argument is without merit.

The term "photograph" is defined as "a picture, image, or likeness obtained by photography." Webster's Third New International Dictionary 1702 (2002). "Photography," in turn, is defined as "an art or process of producing a negative or positive image directly or indirectly on a sensitized surface by the action of light or other form of radiant energy." Webster's Third New International Dictionary 1702 (2002). Based on these definitions, we conclude that "a photograph is the exposure of the film at the time the picture is snapped." *Schneider v. Florida*, 700 So. 2d 1239, 1240 (Fla. App. 1997). The undeveloped film seized in defendant's residence was within the scope of the search warrant.

In a related argument, defendant contends that the police needed a second warrant in order to process the undeveloped film. This argument is also without merit.

In our view, the authority granted by the warrant to seize the photographs/film included as a necessary

component the authority to develop the film. *Wisconsin v. Petrone*, 161 Wis. 2d 530, 545, 468 N.W.2d 676, 681 (1991) ("Because the undeveloped film was lawfully seized pursuant to the warrant, the deputies were justified in developing and viewing the film"), *rev'd in part on other grounds*, 272 Wis. 2d 444, 681 N.W.2d 479 (2004). We find support for this view in the reasoning of the Wisconsin Supreme Court, which stated:

"Developing the film is simply a method of examining a lawfully seized object. Law enforcement officers may employ various methods to examine objects lawfully seized in the execution of a warrant. For example, blood stains or substances gathered in a lawful search may be subjected to laboratory analysis. [Citation.] The defendant surely could not have objected had the deputies used a magnifying glass to examine lawfully seized documents or had enlarged a lawfully seized photograph in order to examine the photograph in greater detail. Developing the film made the information on the film accessible, just as laboratory tests expose what is already present in a substance but not visible with the naked eye. Developing the film did not constitute, as the defendant asserts, a separate, subsequent unauthorized search having an intrusive impact on the defendant's rights wholly independent of the execution of the search warrant. The deputies simply used technological aids to assist them in determining whether items within the scope of the warrant were in fact evidence of the crime alleged." *Petrone*, 161 Wis. 2d at 545, 468 N.W.2d at 681.

In the case at bar, there was no need for the authorities to obtain a second warrant in order to develop and view the film seized from defendant's residence. The authority to develop the film was included within the authority granted by the original warrant to seize the photographs/film.

Defendant has failed to show a reasonable probability that the circuit court would have granted a motion to suppress the photographs. Accordingly, counsel's failure to move to suppress the photographs did not prejudice

defendant. Therefore, no ineffective assistance of counsel has been established.

### 2. *Failure to Challenge Effectively the State's DNA Evidence*

Defendant's second ineffective-assistance argument is that his trial counsel was ineffective for failing to challenge effectively the State's DNA evidence. Defendant contends that his counsel (1) should have challenged the qualifications of the State's DNA expert, and (2) should have challenged more vigorously the DNA evidence itself, such as by retaining his own expert.

As previously indicated, in order to succeed on a claim of ineffective assistance, a defendant must meet both prongs of the *Strickland* test. The defendant must show that: (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant such that he was deprived of a fair trial. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. In considering whether counsel's performance was deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 100 L. Ed. 83, 93, 76 S. Ct. 158, 164 (1955). Generally, matters of trial strategy will not support a claim of ineffective assistance of counsel unless counsel failed to conduct any meaningful adversarial testing. *People v. Guest*, 166 Ill. 2d 381, 394 (1995).

In the case at bar, defendant argues, first, that the State's DNA expert, Kelly Gannon, lacked sufficient qualifications to be considered an expert. Defendant objects that Gannon (1) had no graduate degree, nor was she working toward earning such a degree; (2) her two

publications were in reality "poster presentations," *i.e.*, printed versions of two presentations she had given at the same symposium; and (3) she had testified as an expert on only two previous occasions. Defendant also objects that Gannon's training had been "simply on-the-job with periodic proficiency tests," and he complains that his counsel did not question Gannon as to her performance on those proficiency tests.

Defense counsel raised the first two of these points in his cross-examination of Gannon before the trial judge allowed her to testify as an expert. With regard to the third point, there was no need for counsel to question Gannon about the number of times she had testified as an expert. The State had elicited this information during direct examination. There was also no reason for counsel to question Gannon about her performance on proficiency tests. The State had already elicited testimony from Gannon that she had passed her twice-yearly proficiency tests. We conclude that, with regard to the challenging of Gannon's qualifications as an expert, it cannot be said that counsel failed to conduct meaningful adversarial testing. Defendant has failed to show that his counsel's performance was deficient.

Defendant next argues that his counsel was ineffective for failing to challenge effectively the DNA evidence presented by Gannon. Defendant complains, for example, that his counsel failed to retain his own DNA expert, and failed to "test the validity of the DNA evidence" presented at trial by inquiring into the methods of validation and verification used by Gannon's lab.

The decision whether to call particular witnesses is a matter of trial strategy and thus will not ordinarily support an ineffective-assistance-of-counsel claim. *People v. Ramey*, 152 Ill. 2d 41, 54 (1992). Moreover, defense counsel did question Gannon on cross-examination about validation and verification. In response to counsel's ques-

tions about the validation methods used by her lab, Gannon stated that two such methods were utilized—peer validation and administrative validation. Gannon explained what each method entailed. Counsel also asked Gannon if an independent laboratory had reviewed her work in the case at bar. She answered this question in the negative.

Defendant argues further that, with regard to challenging the DNA evidence, his trial counsel failed to question Gannon as to "the admitted degradation of the [carpet] sample[,] which had been exposed to heat (fire and sun), rain and toxic cleaning compounds, including bleach." We disagree. As the appellate court below observed, "[c]ounsel cross-examined Gannon extensively on *** the deterioration of the DNA sample caused by exposure to the elements and to cleaning solutions." 347 Ill. App. 3d at 1054.

Defendant has failed to establish that his trial counsel's performance in challenging the State's DNA evidence fell below an objective standard of reasonableness. *People v. Lawton*, 212 Ill. 2d 285, 302 (2004). No ineffective assistance of counsel has been shown.

### C. Instances of Prosecutorial Misconduct

Defendant next argues that the State committed reversible error by commenting on defendant's right to remain silent, and by implying, in the State's questioning of the State's DNA expert, that the DNA evidence was available to the defense to conduct its own analysis. The State points out that defendant has forfeited these two issues by failing to object at trial and failing to raise them in his posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, defendant argues that his challenge should be considered under the plain-error doctrine. "Under the plain error doctrine, a reviewing court may consider a trial error not properly preserved when (1) the evidence in a criminal case is closely balanced or (2)

where the error is so fundamental and of such magnitude that the accused was denied the right to a fair trial." *People v. Williams*, 193 Ill. 2d 306, 348-49 (2000). However, an initial step in determining whether the plain-error doctrine applies is to determine whether there has been reversible error. *Williams*, 193 Ill. 2d at 349 ("Absent reversible error \*\*\*, there can be no plain error").

## 1. *The State's Questioning of Law Enforcement Officials*

Defendant urges us to find prosecutorial misconduct first in the State's questioning of the two Lake County officers who interviewed defendant in St. Louis. During this interview, defendant answered most of the officers' questions but declined to answer three of them. Defendant argues that the State "repeatedly questioned" the officers about defendant's refusal to answer these questions, in violation of the rule set forth in *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). Under *Doyle*, the prosecution may not impermissibly comment on the defendant's silence when he has invoked the right to remain silent. *Doyle*, 426 U.S. at 619, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245.

According to the testimony of the two officers, defendant was advised of his *Miranda* rights but agreed to speak to the officers. Specifically, defendant told the officers: "I guess I'll answer some of your questions." During the ensuing interview, defendant gave the officers information about a number of matters, including, for example, the fire at his home in Champaign and where he was at the time of the fire. Defendant told the officers he was in Chicago when the fire occurred, but he declined to say where he was, specifically, in Chicago. Defendant also refused to give the officers Rivera's telephone number. In addition, defendant informed the officers that he was unemployed, but refused to provide them with information about his previous employment.

*Doyle* applies only when a defendant invokes his right to remain silent. *People v. Henson*, 58 Ill. App. 3d 42, 46 (1978). Here, defendant waived his right to remain silent and answered most of the officers' questions. Once the right to remain silent has been waived, it can be invoked only by a defendant's positive assertion that he wants to remain silent. *People v. Trumbull*, 67 Ill. App. 3d 262, 265 (1978). Defendant did not tell the detectives that he wanted to remain silent. The *Doyle* rule, therefore, does not apply in this instance. *People v. Mata*, 243 Ill. App. 3d 365, 376 (1993) ("where a defendant has expressly waived his right to remain silent and made a statement, the *Doyle* rule is generally inapplicable").

Because there is no reversible error, there can be no plain error. Defendant's argument as to this issue is forfeited.

2. *The State's Redirect Examination of Its DNA Expert*

Defendant also claims that there was prosecutorial misconduct in the State's redirect examination of the State's DNA expert, Kelly Gannon. In its redirect examination of Gannon, the State established that the blood sample used by Gannon in her analysis was also available to the defense for independent testing but no request for such testing had been made. According to defendant, this line of questioning implied that the defense could have conducted an independent DNA analysis but chose not to for fear of the results. In defendant's view, this impermissibly shifted the burden of proof from the State to defendant.

Prior to the State's questions regarding the availability of the DNA sample, defense counsel, on cross-examination, repeatedly questioned Gannon as to the degradation of the sample and whether the lab's validation procedures corroborated her results. Defense counsel's last question to Gannon came in this colloquy.

"Q. As I understand your testimony, *** an independent

laboratory in this particular case[ ] did not review your work, is that correct?

A. That's correct."

Immediately thereafter, the State began its redirect with the following exchange:

"Q. Ms Gannon, you indicated earlier that you retained documentation and samples in this case in the laboratory[, and] even now, continue to retain certain of the samples in this case, is that right?

A. That's correct.

Q. Those standards and samples are available for review and retesting by the state or by the defense if requested, correct?

A. Correct.

Q. Was any request made of you by anyone to retest in this case?

A. No, there was not."

In his cross-examination of Gannon, defense counsel emphasized the degradation of the DNA sample and the validation methods used to verify Gannon's test results, thus casting doubt on those results. The purpose of the State's questioning on redirect, which was invited by defense counsel's questioning on cross-examination, was to answer the doubts raised by that cross-examination. In such situations, error cannot normally be claimed. *People v. Dixon*, 91 Ill. 2d 346, 350-51 (1982) ("a defendant cannot ordinarily claim error where the prosecutor's remarks are in reply to and may be said to have been invited by defense counsel's argument").

The State's reference to the availability of the DNA samples to the defense was brief and was not repeated. Moreover, during his closing argument, defense counsel referred to the State's questioning of Gannon on redirect and argued forcefully that the burden of establishing guilt remains at all times with the State. This concept was reinforced by the jury instructions.

We conclude that the State's questioning of Gannon regarding the availability of the DNA sample did not

constitute reversible error. Accordingly, the plain error rule does not apply. Defendant has forfeited his argument on this issue.

### D. Sufficiency of the Evidence

Defendant next argues that the evidence presented at trial was insufficient to sustain his conviction. According to defendant, he was not proven guilty beyond a reasonable doubt.

When reviewing an insufficiency of the evidence claim in a criminal conviction, a court determines whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). "We will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt." *Evans*, 209 Ill. 2d at 209.

In our harmless-error analysis in this case, we held that the evidence presented at trial, though largely circumstantial, nevertheless was overwhelming in support of defendant's convictions. This analysis excluded Rivera's grand jury testimony. Looking at this evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of the crimes charged beyond a reasonable doubt. In our view, the evidence is not so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt. We therefore reject defendant's claim that he was not proven guilty beyond a reasonable doubt.

### E. Sentence

#### 1. *First Degree Murder*

Finally, defendant raises three issues with respect to his sentence. He argues first that his sentence for first

degree murder was excessive. As the appellate court noted, a trial court has broad discretion in sentencing and should be reversed only when it abuses that discretion. 347 Ill. App. 3d at 1056, citing *People v. Coleman*, 166 Ill. 2d 247, 258 (1995). In arriving at defendant's sentence, the circuit court considered a broad range of information, including arguments in aggravation and mitigation, the presentence report, and letters written in support of defendant. The sentence of 50 years is within the statutory range of 20 to 60 years for first degree murder. 730 ILCS 5/5—8—1(a)(1)(a) (West 2002). We find no abuse of discretion.

### 2. *Concealment of a Homicidal Death*

Defendant also contends that his five-year sentence for concealment of a homicidal death should have been ordered served concurrently with the murder sentence rather than consecutively because the two offenses were part of the same course of conduct. As the State points out, however, a consecutive sentence was statutorily mandated here. Section 5—8—4(a)(i) of the Unified Code of Corrections provides, in pertinent part:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct ***, unless:
>
>> (i) one of the offenses for which defendant was convicted was first degree murder *** and the defendant inflicted severe bodily injury, ***
>>
>> * * *
>>
>> in which event the court shall enter sentences to run consecutively." 730 ILCS 5/5—8—4(a)(i) (West 2002).

Defendant concedes that his convictions for first degree murder and concealment of a homicidal death were part of a single course of conduct and the victim in this case sustained severe bodily injury. The sentencing judge was required to impose consecutive sentences.

### 3. *Elements of the Crime Considered as an Aggravating Factor*

Defendant also argues that "the trial court erred in the determination of his sentence by considering as an aggravating factor elements which were inherent [in] and essential to the crime and the nature of the offense." Specifically, defendant contends that the trial court improperly considered steps that defendant took to avoid being caught. In support of this argument, defendant cites to a page from the transcript of the sentencing hearing. However, there is no mention on this page of any attempt by defendant to avoid being caught. Indeed, an examination of the transcript of the sentencing hearing reveals no mention by the trial judge of defendant's attempt to avoid being caught. Defendant's argument has no basis. Accordingly, we reject it.

### CONCLUSION

For the foregoing reasons, we affirm the judgment of the appellate court, which affirmed defendant's convictions and sentence.

*Affirmed.*