# Illinois Official Reports

## Appellate Court

---

**People v. Cole, 2017 IL App (2d) 160334**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL T. COLE, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-16-0334 |
| Filed | June 29, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 14-CF-29; the Hon. James C. Hallock, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | William P. Gibbs and Timothy K. Mahoney, of McNamee & Mahoney, Ltd., of Dundee, for appellant.<br><br>Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, Lawrence M. Bauer, and David A. Bernhard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.<br>Justices Zenoff and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Michael T. Cole, was found guilty of one count of child abduction by a noncustodial parent (720 ILCS 5/10-5(b)(3) (West 2014)). He argues that the State failed to present sufficient evidence that he took the child without the mother's consent. We agree, and thus we reverse his conviction.

¶ 2                                    I. BACKGROUND

¶ 3    Defendant was indicted on the count of child abduction, of which he was ultimately convicted. The indictment charged that defendant, whose paternity of D.C. was legally established, but who lacked legally established custodial rights, intentionally removed D.C. without the consent of Evonne Bishop, D.C.'s mother.

¶ 4    Defendant had a bench trial. During its opening statement, the State said that the evidence would show that defendant did not have Bishop's permission to take D.C. anywhere. Further, "immediately" after defendant left with D.C., Bishop tried to call defendant on his cell phone, "but the phone was going straight to voicemail so she couldn't reach defendant on the phone, [so she] tried making a few calls to family members." When "nothing *** pann[ed] out," she called the police.

¶ 5    Bishop was the State's first and principal witness. Her testimony was not what the State told the court to expect. Critically, she said that she had given defendant permission to take D.C. to breakfast the morning of the incident. Further, she denied making any attempt to contact defendant after he left with D.C.

¶ 6    Bishop testified that she and defendant had been in an on-and-off dating relationship for about 20 years. D.C. was born on July 6, 2012; defendant had signed an Illinois voluntary acknowledgment of paternity and was listed as D.C.'s father on the certificate of live birth. Bishop also had three children with her former husband. Defendant had lived on-and-off with Bishop for four years; when she "had problems with him," she would ask him to leave. Other than the acknowledgment of paternity, all of the agreements that she and defendant had about D.C. were informal.

¶ 7    In January 2014, Bishop had asked defendant to leave the house and to get counseling, but he was visiting daily. On January 7, defendant came over in the evening to visit D.C. Bishop would not permit him to stay the night, but she agreed that he could come over in the morning to take D.C. to breakfast. To her surprise, defendant arrived at her front door at about 3:30 a.m. The State asked, "Had you called and invited him to come over at that hour of the morning?" She responded, "He was supposed to come over that morning, but I didn't anticipate it to be 3:30 in the morning." She opened the door to him; he came in, walked to D.C.'s bedroom, and took D.C. from his bed. D.C., then about a year and a half old, shared a bedroom with his older half-sister. He was asleep in a twin bed, wearing one-piece pajamas with feet. Defendant picked him up while he slept and carried him out of the house. The only thing that defendant said while he was in the house was that "it didn't have to be this way." Defendant carried D.C. to his truck, which was parked in front of Bishop's house. Bishop thought that defendant had not put D.C. in a car seat. The State asked, "Did the defendant have your permission to be taking [D.C.] anywhere?" Bishop responded, "Not at that point in time." Defendant did not say anything about where he was taking D.C. or when he would return him. Bishop testified that

she had not said anything to defendant; she explained that things had happened too fast, but she did not testify to having felt any fear.

¶ 8 When defendant left, Bishop did not try to contact defendant but did call the South Elgin police. A few hours later, defendant called. Bishop told him to bring D.C. home, which he did. However, defendant had also called once while Bishop was speaking with the police, a call that she did not answer. (Bishop later explained that the phone was in another room.) The call in which Bishop asked defendant to bring D.C. home came about 10 minutes after the police had left. Defendant's two calls were about 20 minutes apart and came after defendant had been gone with D.C. for "a few hours." The State asked Bishop how she felt after the second call: "Did you even know if they were gonna come back?" Bishop said that she was reassured: "I trusted that he was gonna bring him home after he called." The State concluded its direct examination shortly after Bishop answered.

¶ 9 Near the start of cross-examination of Bishop, defense counsel questioned her about the agreement she had with defendant that he and D.C. could go to breakfast:

"Q. [Defense counsel:] As [defendant] was visiting, arrangements were made at that time that he would *** come and get [D.C.] the next day to take him to breakfast or to take him out; correct?

A. [Bishop:] Correct.

Q. And there was some other conversation and he left; correct?

A. Yes.

Q. And he wanted to stay the night. He wanted to spend the night there with you and [D.C.] and take [D.C.] in the morning; correct?

A. He did, yes.

Q. So the only surprise in relation to your surprise when he came there was there was an agreement that he have [D.C.] the next day; correct?

A. Correct.

Q. And it was going to be for breakfast; correct?

A. Yes.

Q. It was just that he came there at approximately sometime after 3:00 in the morning; correct?

A. Yes."

¶ 10 Defense counsel also confirmed that Bishop had not objected to defendant's removal of D.C.:

"Q. [Defense counsel:] He removed [D.C.], and you didn't say anything to him?

A. [Bishop:] No. It happened very fast. Yes."

¶ 11 Defense counsel also questioned Bishop about defendant's relationship with D.C. She acknowledged that defendant had been a very active parent. He would see D.C. every other day, at least, and would often come five or six days in a row. In particular, before the incident, she had sometimes allowed defendant to come over in the morning to take D.C. to breakfast. Overall, she thought that defendant had a good relationship with D.C. Beyond that, she agreed that defendant sometimes had a car seat in his truck for D.C. and that she did not know whether one was present on January 8. She also agreed that defendant had sometimes kept clothing for

D.C. in his truck. Bishop also admitted that, when she asked defendant to bring D.C. home, defendant arrived within 10 or 15 minutes.

¶ 12    On redirect, the following dialogue took place:

"Q. [The State:] Did you give [defendant] consent to be with [D.C.] at 3:30 in the morning?

A. [Bishop:] It was not arranged.

Q. Is that yes or no?

A. No, not at that time.

Q. Did you ever have any concerns about the defendant spending time with [D.C.]?

A. *My concern was our issues, not so much with him being with [D.C.]*

Q. And what issues were those?

A. We just don't seem to always get along, and he had drug issues at some point in time.

Q. And because of that would that cause you to have concerns about him being with [D.C.]?

A. I can't say that he was a bad father. I can't say that.

Q. Does he have a temper?

A. I think he's unreasonable when he's angry with me. Ever directed towards my children or towards [D.C.]? No.

Q. Well—

A. Unreasonable, yes.

Q. The three other kids that you have with your ex-husband, are they all boys, all girls, or some of each?

A. I have two girls and one boy.

Q. Isn't it true that the defendant had previously threatened your other son?

A. They had an altercation.

[Defense counsel]: Object to relevance.

* * *

[The State]: Well, first of all, the witness testified that he's never threatened any of her children, number one, so this is to rebut that claim.

Number two, I think in the cross-examination they were trying to make the defendant out to be a model father, so this would rebut that testimony.

THE COURT: Objection will be overruled. It will come in for what it's worth.

***

Q. [The State:] Did he ever threaten your other son?

A. [Bishop:] They had an altercation at one time. ***

* * *

Q. My question was, though, did he ever make threats to your other son?

A. Again, I mean, I don't recall exactly what he had said to him, but they definitely had an altercation." (Emphasis added.)

Over defense counsel's ongoing objections, the court allowed the State to have Bishop read from a police report that she had made on November 14, 2014—that is, 10 months after the incident charged. In the report, Bishop reported that defendant came to her door, saying that he was going to " 'kick [her] ass.' " She also reported that defendant was " 'making threats' " to her son earlier. After Bishop told him to leave, " '[defendant] threw a kid's bike at my car and backed up and rammed his truck into my ex-husband's truck, front left side, and then he left.' "

¶ 13   On recross-examination, Bishop said that the incident to which the report related involved Bishop's ex-husband, Bishop's 17-year-old son, and defendant. The three were involved in an argument, having to do with car parts, that had escalated in the way that the police report described but had also involved her ex-husband keying defendant's vehicle.

¶ 14   The State's second witness was Rich Bennett, a sergeant with the South Elgin police, who was one of the officers dispatched to Bishop's house. He arrived around 4 a.m., having been dispatched to deal with what he understood to be a "custody dispute." Bishop showed him where D.C. slept, and he saw the other three children. He did not testify as to Bishop's demeanor.

¶ 15   The State rested after Bennett's testimony. Defendant moved for a directed finding, arguing that because defendant and Bishop had agreed that defendant could take D.C. to breakfast, the State had failed to show that the removal of D.C. was without Bishop's consent. He argued that he might have acted in a particularly annoying and inconvenient way, but that he did not abduct D.C. The State responded that the "un-Godly" hour at which defendant had come to the door precluded an innocent explanation. The court denied defendant's motion, and defendant rested without presenting any evidence. In closing, the State relied again on the unusual hour. Further, it argued that, by lifting D.C. from his bed while he slept, defendant had used force; in this argument, the State implicitly equated force and lack of consent.

¶ 16   The court found defendant guilty:

"The Court *** finds the testimony of the witnesses to be very credible ***.

The Court finds that apparently the child's mother did give the defendant permission to take the child for breakfast.

* * *

[T]he defendant *** comes in at 3:30 in the morning, picks a 1-and-a-half-year-old child up out of bed out into the January weather in his PJ's.

***

[T]he Court cannot find that there was consent *** for this type of removal. Once the removal was made, once the defendant drove away, the child was concealed and detained from the mother."

In support of its reasoning, it argued that force was involved in the offense:

"I think there was force.

No, there was not a weapon that was brandished, but he went into the bedroom. The child was sound asleep, and he physically picked the child up, cradled him in his arms, and walked out the door.

He removed him by force, not force that would hurt somebody, but force that wasn't consensual. And Miss Bishop testified this happened so fast. The fact that she wasn't able to yell 'Stop,' the fact that she wasn't able to yell 'Put him down,' the fact

that she didn't try and physically do something to the defendant doesn't mean that it was consensual."

¶ 17 Defendant filed a posttrial motion in which he asserted (1) that the State's evidence was insufficient, (2) that the court had improperly admitted evidence of the altercation in which defendant was involved, and (3) that the court had improperly considered Bishop's comment relating to drug use by defendant. Defendant argued that, because the altercation involved different people and occurred 10 months after the alleged abduction, it was prejudicial and irrelevant. The State argued that the evidence was proper as impeachment of Bishop's favorable statements about defendant's relationship with D.C. and that, in any event, if it were improper, the court would have disregarded it.

¶ 18 The court ruled that the evidence was sufficient:

"The finding of guilty was based on the defendant showing up at 3:00 a.m., taking the child out of the child's bed, leaving the house with the child. It was clear that there was no consent by the mother for this trip ***."

¶ 19 The court sentenced defendant to probation. Defendant filed a notice of appeal that day.

¶ 20                                                    II. ANALYSIS

¶ 21 On appeal, defendant argues first that the evidence was insufficient to sustain a conviction and second that the court improperly admitted other-crimes evidence. On the sufficiency of the evidence, defendant argues that Bishop's testimony was insufficient to show that defendant had the necessary intent to "remove" D.C. in the relevant sense, or to show Bishop's nonconsent to the removal. On the other-crimes evidence, defendant argues specifically that the evidence of the altercation was both irrelevant and contrary to the rule against the admission of other bad acts to prove that the commission of the charged offense was consistent with defendant's character.

¶ 22 Responding to defendant's challenge to the sufficiency of the evidence, the State argues that the facts that Bishop immediately called the police and that defendant was unreasonable when angry were sufficient to support the inference that Bishop did not consent to defendant's removing D.C.

¶ 23 We hold that the evidence was insufficient to sustain the conviction, even considering the other-crimes evidence that defendant challenges. We thus need not address the admissibility of that evidence and will do so only in passing at the end of this decision.

¶ 24 We review the sufficiency of the evidence under the familiar standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), as adopted by *People v. Collins*, 106 Ill. 2d 237 (1985): when a reviewing court decides a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319). "[W]here the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt," but "[i]n conducting this inquiry, the reviewing court must not retry the defendant." *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004). "Testimony may be found insufficient under the *Jackson* standard, but only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt."

*Cunningham*, 212 Ill. 2d at 280. Although we must accord great deference to the fact finder's decision to accept testimony, and must view the evidence in the light most favorable to the prosecution, the fact finder's decision is not conclusive. *Cunningham*, 212 Ill. 2d at 280.

¶ 25 The State charged defendant under section 10-5(b)(3)(B) of the Criminal Code of 2012:

> "A person commits the offense of child abduction when he or she does any one of the following:
>
> * * *
>
>     (3) Intentionally conceals, detains, or removes the child without the consent of the mother or lawful custodian of the child if the person is a putative father and *** (B) the paternity of the child has been legally established but no orders relating to custody have been entered." 720 ILCS 5/10-5(b)(3)(B) (West 2014).

Defendant argues that there were no actions or statements by Bishop that could have made him aware that he was taking D.C. without Bishop's consent. Neither party suggests that this is an absolute-liability offense as to consent—if anyone had made that suggestion, we would have rejected it as inconsistent with the legislative interest in supporting unmarried fathers' involvement in their children's rearing. Thus, we can conclude that the State had to prove that defendant had a standard criminal *mens rea* (intent, knowledge, or recklessness) as to Bishop's lack of consent. See 720 ILCS 5/4-3(b) (West 2014) (if a statute does not prescribe a particular mental state applicable to an element, any mental state defined in section 4-4, 4-5, or 4-6 is applicable). When it promised in its opening statement that it would show that Bishop never consented to defendant's taking D.C. anywhere, the State treated consent as an affirmative defense. (The trial court, in convicting defendant, seems to have done likewise.) However, the lack of consent, being fundamental to the offense, is necessarily an element thereof. See *People v. Pettus*, 84 Ill. App. 3d 390, 393 (1980).

¶ 26 Regardless of defendant's mental state as to consent, no rational trier of fact could have concluded that Bishop did not consent—explicitly, tacitly, or both. See 720 ILCS 5/10-5(a)(2.1) (West 2014) ("express consent" means "oral or written permission that is positive, direct, and unequivocal, requiring no inference or implication to supply its meaning"). Despite the great clarity with which Bishop testified to her displeasure with defendant's unreasonably early appearance, she never testified that she objected to defendant's taking D.C. out. Rather, she testified that she explicitly consented to his taking D.C. to breakfast. But, even on the assumption that defendant would have been reckless to presume that Bishop's explicit consent extended to breakfast at 3 a.m., the evidence suggests her tacit consent to the early departure. No rational fact finder would believe that a mother who was objecting to a child's removal would remain completely silent under these circumstances, despite the fact that it "happened so quick." To stand by as she did, she must have had confidence that defendant was merely trying to annoy her by picking an unreasonable hour for a breakfast outing. Indeed, this is what Bishop said: "*My concern was our issues, not so much with [defendant] being with [D.C.]*" (Emphasis added.) Thus, as the evidence showed Bishop's consent, the State had to prove beyond a reasonable doubt that Bishop *withdrew* that consent and communicated that withdrawal to defendant before he took D.C. from the home. The evidence contained no trace of such a withdrawal.

¶ 27 The State argues that the court could properly infer Bishop's lack of consent to the removal from the fact that she called the police shortly afterward. Bishop's consent *as such*—as opposed to her manifestation of consent—is a tangent here, given that the State does not argue

for an absolute-liability offense. However, we reject this argument on its own terms. The record contains several pieces of evidence that strongly imply that defendant and Bishop were *both* playing games. Certainly, defendant's early morning arrival is understandable that way, but several of Bishop's acts also make more sense if she is understood as thinking that she was letting defendant have the rope to hang himself. She stood entirely silent as defendant took D.C. She did not try to call defendant after he left. She seems to have reported a "custody dispute" to the police. She allowed a call to go unanswered while she was talking to the police. We do not know whether she knew the source of the call when it came in or learned it only after, but we do know that she could tell that it came from defendant. She did not try to return that call, but instead waited approximately 20 minutes for him to call again. These are all the actions of a mother who has no fear for her child, and those actions taken as a whole preclude a proper finding that she did not consent.

¶ 28   The court assumed that Bishop feared defendant too much to object to his removal of D.C.:

> "He removed him by force, not force that would hurt somebody, but force that wasn't consensual. And Miss Bishop testified this happened so fast. The fact that she wasn't able to yell 'Stop,' the fact that she wasn't able to yell 'Put him down,' the fact that she didn't try and physically do something to the defendant doesn't mean that it was consensual."

The court imagined a state of mind for Bishop that no rational trier of fact could have inferred beyond a reasonable doubt. The State's case was devoid of the details tending to support shock and fear. No evidence suggests that defendant did anything more alarming than arrive much too early. Bennett, who arrived in response to Bishop's 911 call, did not testify to any distress on Bishop's part. The State attempted to elicit details from Bishop to portray defendant as someone she feared, and when she merely described him as unreasonable, the State began its quasi-impeachment. However, instead of producing a history of domestic abuse that might justify the court's assumption that Bishop was too frightened to object, the State could produce only a later episode of angry property damage of which Bishop was not the target. Although it was commendable for the court to be alert for the possibility of a reluctant witness, it could not properly conclude that Bishop was such a witness on such slight evidence.

¶ 29   Although we have concluded that defendant's conviction is unsustainable even without addressing defendant's objections to the other-crimes evidence, we now briefly consider the unusual nature of that evidence—evidence that, we note, the State makes scant attempt to justify. We agree with defendant that it was error for the court to allow all this evidence of other bad acts. We draw particular attention to the fact that, although the alleged abduction took place on January 8, 2014, the incident about which the State introduced evidence took place on November 14, 2014. This largely negates the relevance of that evidence. The State implies that, given that defendant elicited evidence suggesting that he had a good relationship with D.C., it was entitled to show that defendant was a "sometime[s] angry, threatening individual." Taken uncharitably, this argument comes perilously close to suggesting that the State needed the evidence solely for its unfair prejudicial effect. At best, we can understand the State to suggest that defendant, by asking whether he had ever threatened any of Bishop's children, had placed his character at issue. See Ill. R. Evid. 404(a)(1) (eff. Jan. 1, 2011) ("In a criminal case, evidence of a pertinent trait of character [is admissible if] offered by an accused, or by the prosecution to rebut the same[.]"). First, the mere fact that an accused offers evidence that tends to place him or her in a favorable light cannot, by that tendency alone, place his or

her character at issue. Moreover, given that *Bishop's perception* of D.C.'s safety with defendant was specifically at issue, the reasonable view is that defendant's questioning of Bishop went to that, and not to any character trait of defendant's.

¶ 30                                                         III. CONCLUSION
¶ 31          For the reasons stated, we reverse defendant's conviction.

¶ 32          Reversed.