2020 IL App (1st) 170976-U

FOURTH DIVISION
March 31, 2020

No. 1-17-0976

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13 CR 21500 |
| JAIME RODRIGUEZ, | ) ) | |
| Defendant-Appellant, | ) ) ) | Honorable Jeffrey L. Warnick, Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for aggravated kidnapping where the evidence was sufficient to prove him guilty beyond a reasonable doubt. Pursuant to Illinois Supreme Court Rule 472(e) (eff. May 17, 2019), we remand the matter to the trial court to allow defendant to file a motion addressing the alleged errors in the trial court's assessment of fines, fees, and costs.

¶ 2    Following a bench trial, defendant Jaime Rodriguez was convicted of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)) and aggravated kidnapping (720 ILCS 5/10-2(a)(2) (West 2016)) and was sentenced to 21 years and six years respectively.

His sentences were to be served consecutively. On appeal, defendant asserts that only (1) his conviction for aggravated kidnapping should be reversed because the State failed to prove beyond a reasonable doubt that he confined the minor victim without the consent of the victim's parent, and (2) the trial court's assessment of fines, fees, and costs improperly included an electronic citation fee of $5. Defendant is not appealing his conviction for predatory criminal sexual assault of a child. For the following reasons, we affirm defendant's conviction and, with regard to the electronic citation fee, we remand for further proceedings consistent with Illinois Supreme Court Rule 472 (eff. May 17, 2019).

¶ 3                                    I. BACKGROUND

¶ 4      Defendant was indicted with multiple offenses arising from his sexual assault of four-year-old D.C., during which it was alleged that defendant brought D.C. into his basement and inserted his penis into D.C.'s anus. The State proceeded to trial on one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)) and one count of aggravated kidnapping (720 ILCS 5/10-2(a)(2) (West 2016)), based on defendant kidnapping D.C., who was under the age of 13.

¶ 5      Maribel G. (Maribel), D.C.'s mother, testified as follows.[1] In September 2013, defendant's wife, Maria Rodriguez (Rodriguez), agreed to babysit Maribel's two children on the weekends while Maribel and her husband worked. At that time, D.C. was four and E.C. was six. Rodriguez also had two children, nine-year-old Daisy and 17-year-old Raul. The Rodriguez family lived near Maribel's residence in Evanston. Maribel had never met defendant.

¶ 6      On Saturday October 12, 2013, Maribel dropped her children off with Rodriguez, went to work, and returned to pick up her children at approximately 5:20 p.m. She entered the

---

[1] We will refer to D.C.'s mother as Maribel to protect D.C.'s privacy as he was a minor at the time the sexual assault occurred.

Rodriguez residence and observed Rodriguez in the kitchen. D.C., E.C., Daisy, and Raul were in the living room with Rodriguez's mother. According to Maribel, D.C. seemed "very sad." Maribel then drove her children to the store where D.C. indicated he needed to go to the bathroom. Maribel, D.C., and E.C. entered a single-stall bathroom together. When D.C. was finished, E.C. stated, "blood came out of [D.C.] again" and Maribel observed blood in the toilet bowl. She asked D.C., "who did this to you[?] *** was it the uncle, the brother, or the father of Daisy?" D.C. responded, "it was Daisy's father." Maribel then asked a store employee to call the police, cleaned D.C., and flushed the toilet. As she waited, she continued to speak with D.C. who related that the incident occurred in the basement with a knife. Evanston police officers subsequently arrived and Maribel, D.C., and E.C. were transported to Evanston Hospital. A doctor examined D.C. and collected a sexual assault kit. The next morning, D.C. stated that defendant "took me to the basement," "he closed the door and he turned the lights off," and "then coco (the boogeyman) bit me" on the right shoulder.

¶ 7    D.C., who was six years old at the time of trial, testified as follows. He and his sister, E.C., used to stay at Daisy's residence when his parents went to work. D.C. was not allowed in Daisy's basement because her father (defendant) had told him that a monster lived there. Nevertheless, he entered the basement on the day of the sexual assault. When the State inquired how he arrived in the basement, D.C. responded, "The dad of Daisy." The basement was dark and D.C. observed a knife. According to D.C., defendant "put a knife in my butt" and "it hurt."

¶ 8    Thereafter, D.C.'s mother picked up D.C. and E.C. and drove them to a store. D.C. went to the bathroom at the store, which was painful and caused blood to come out. Police officers arrived and D.C. took an ambulance to a hospital. A doctor treated D.C. and police officers showed him photographs of several men. At trial, D.C. viewed the same photographs but did not

recognize any of the individuals.  D.C. went home from the hospital that night.  The next morning, he had to go to the bathroom but was afraid to go because he believed the monster from the basement would return.  On cross-examination, D.C. acknowledged that Daisy's uncle was also present in her residence that day.

¶ 9     Christina Ayala (Ayala) testified she was a forensic interviewer at the Chicago Children's Advocacy Center.  She interviewed D.C. on October 14, 2013.  The interview was videotaped and played at trial.  During the interview, D.C. stated that a relative of Daisy instructed him to go to the basement, took off D.C.'s pants and underwear, and cut him by putting a knife "in [his] butt."  Ayala testified it was not unusual for children to describe sexual assault as being stabbed because they can only explain the incident based on past experiences.

¶ 10    Dr. Matthew Dube (Dr. Dube) examined D.C. at Evanston Hospital after the sexual assault and testified as an expert in the field of emergency medicine, emergency pediatric medicine, and the emergency medical treatment of children suffering from sexual assault or abuse.  He testified there were no injuries to D.C.'s anus or rectum, which was not unusual because those areas heal quickly.  He explained that there are no visible injuries in most cases of sexual assault involving minor victims.  After examining D.C., Dr. Dube collected a sexual assault kit and tendered it to an Evanston police officer.  The sexual assault kit included anal, oral, and penile swabs and D.C.'s clothing.

¶ 11    Detective Otis Velma (Detective Velma) of the Evanston police department testified he was assigned to investigate D.C.'s sexual assault allegations.  He learned defendant's name and address and created a photographic lineup of six individuals.  D.C. viewed the photographic lineup while he was being treated at Evanston Hospital and identified defendant as the man who hurt him.  Detective Velma arrested defendant on October 14, 2013, and interviewed him with

Evanston police officer Pedro Carrasco (Office Carrasco), who acted as a Spanish-English translator.

¶ 12    Officer Carrasco testified to the content of the interview with defendant and Detective Velma.  According to Officer Carrasco, defendant related the following.  Defendant only knew Maribel's family in passing.  He never had contact with D.C. or E.C. because he worked as a landscaper on the weekends while his wife babysat the children.  Defendant admitted to having a drinking problem and that he "loses control" when he drinks.

¶ 13    On the morning of Saturday, October 12, 2013, defendant drank two beers before work. He returned home from work that day at approximately 4 p.m.  He observed D.C. watching television and playfully blocked the television to get D.C.'s attention.  Defendant then entered the basement to change out of his work clothes.  He related to Officer Carrasco that he prohibited the children from entering the basement and told them the boogeyman lived there.  That day, however, D.C. followed defendant down the basement stairs.  Defendant admitted that while in the basement, he penetrated D.C.'s anus with his penis, but he did not know how many times; he believed it was for approximately 30 seconds.  He related that there was no blood on his penis and he did not ejaculate.  Defendant stated, "he was gentle with [D.C.]  He said that he didn't bite him hard because he knew [D.C.] would cry and draw attention of his wife and his mother-in-law. *** He was concerned that they would know what he was doing."  Defendant additionally indicated that his penis was small and he began to cry.  He "blamed his wife for bringing those kinds of temptations into the house and for knowing how he gets" and stated that his wife "should have known what he was doing."

¶ 14    Dr. Jennifer Wagenmaker (Dr. Wagenmaker), a forensic scientist employed by the Illinois State Police at the Forensic Science Center at Chicago, testified as an expert in the field

of forensic biology. Dr. Wagenmaker tested D.C.'s sexual assault kit and clothing. She testified the anal swab and oral swab tested negative for semen and the penile swab tested negative for saliva. In addition, D.C.'s underwear, sweater, jeans, and socks tested negative for semen. Dr. Wagenmaker explained that fluid could have been transferred to D.C.'s body but could have been removed over time due to defecation, urination, or wiping. She further explained it was possible that contact between a penis and anus could fail to produce enough fluid to be detected.

¶ 15    Brian Schoon (Schoon), a forensic analyst for the Illinois State Police at the Forensic Science Center at Chicago, testified as an expert in the field of forensic deoxyribonucleic acid (DNA) analysis. Schoon testified he tested D.C.'s sexual assault kit and clothing. According to Schoon, the penile swab and oral swab matched D.C.'s DNA profile; the rectal swab contained DNA contributed by at least one individual but was not suitable for comparison; and D.C.'s underwear and swabs from both shoulders of his sweater contained a mixture of DNA profiles that were not suitable for comparison. Schoon further testified that the major DNA profile from D.C.'s underwear and sweater matched D.C.

¶ 16    The State rested and defendant moved for a directed finding, which the trial court denied. Defendant then presented his case-in-chief.

¶ 17    Dr. Karl Reich (Dr. Reich), the chief science officer of Independent Forensics, a non-governmental forensic DNA laboratory, testified as an expert in forensic DNA analysis and testing. He observed Dr. Wagenmaker and Schoon test D.C.'s sexual assault kit and clothing and reviewed the results of the tests. According to Dr. Reich, no semen or saliva was discovered and the test results "do not support any allegation of sexual contact." Dr. Reich further testified it was unlikely that an individual could sexually penetrate another without leaving any trace of DNA.

¶ 18     Raul Rodriguez (Raul), defendant's son, testified that he and his uncle, Paolino Patino (Patino), went to work with defendant that day and returned home at 4:10 p.m. Raul then watched television in the living room with Daisy, D.C., E.C., and his grandmother. His mother was in the kitchen. According to Raul, when they entered the residence after work that day defendant immediately retrieved a tool from the rear porch and then returned outside to repair his vehicle. Patino went to the bathroom and then followed defendant outside. Raul further testified D.C. stayed in the living room and no one entered the basement before Maribel picked up her children. On cross-examination, Raul testified defendant drank between one and three beers after work that day before retrieving a tool from inside the residence.

¶ 19     Defendant testified on his own behalf with the assistance of a Spanish translator. He testified consistently with Raul concerning the events that occurred when he returned home from work that day. Defendant acknowledged that his wife took care of D.C. and E.C. on the weekends because she came to an agreement with Maribel. He denied that he admitted to Detective Velma and Officer Carrasco that he sexually assaulted D.C.

¶ 20     On cross-examination, defendant admitted he normally changes out of his work clothes in the basement when he gets home but testified he did not do so that day. He further testified that he drank one beer during lunch. In addition, defendant acknowledged that he prohibited the children from entering the basement by telling them the boogeyman lived there.

¶ 21     Patino and Maria Almansa, defendant's mother-in-law, both testified they did not observe defendant or D.C. enter the basement that day.

¶ 22     After hearing closing arguments, the trial court found defendant guilty of predatory criminal sexual assault of a child and aggravated kidnapping. Defendant presented a motion for a new trial, which the trial court denied. Following the sentencing hearing, the trial court

sentenced defendant to 21 years' imprisonment for predatory criminal sexual assault of a child and six years' imprisonment for aggravated kidnapping, to be served consecutively. This appeal followed.

¶ 23                                    II.  ANALYSIS

¶ 24    On appeal, defendant argues (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt of aggravated kidnapping, and (2) the trial court's assessment of fines, fees, and costs improperly included an electronic citation fee of $5. We address defendant's contentions in turn below.

¶ 25                        A.  Sufficiency of the Evidence

¶ 26    Defendant contends the State failed to prove him guilty beyond a reasonable doubt of aggravated kidnapping. Specifically, he argues the State failed to prove he confined D.C. without Maribel's consent.

¶ 27    "[T]he State carries the burden of proving beyond a reasonable doubt each element of an offense." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). When considering a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found that the essential elements of the offense were proven beyond a reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). It is the responsibility of the trier of fact to fairly resolve conflicts in the testimony, weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. This court will not retry the defendant or "substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of witnesses." *Siguenza-Brito*, 235 Ill. 2d at 224-25. A criminal conviction will be set aside only where the evidence is so improbable or

unsatisfactory as to create a reasonable doubt of the defendant's guilt. *Id*. at 225.

¶ 28    Defendant was found guilty of aggravated kidnapping. 720 ILCS 5/10-2(a)(2) (West 2016). A person commits the offense of aggravated kidnapping as charged in this case if the accused (1) knowingly and secretly confines the victim against his will, and (2) takes as a victim a child under the age of 13 years. 720 ILCS 5/10-1(a)(1), 10-2(a)(2) (West 2016). Under section 5/10-1(b) of the Criminal Code of 2012 (Code), "Confinement of a child under the age of 13 years *** is against that child's or person's will within the meaning of this Section if that confinement is without the consent of that child's or person's parent or legal guardian." 720 ILCS 5/10-1(b) (West 2016). The State was required to prove defendant possessed the standard *mens rea* (intent, knowledge, or recklessness) as to the lack of parental consent to the confinement of the child. *People v. Cole*, 2017 IL App (2d) 160334, ¶ 25.

¶ 29    Defendant concedes the State proved beyond a reasonable doubt that he knowingly and secretly confined D.C. He contends solely that the State failed to introduce any evidence indicating he secretly confined D.C. in the basement *without Maribel's consent*. According to defendant, the unrefuted evidence established that Maribel consented to D.C. being in the Rodriguez residence. For the following reasons, we reject defendant's argument and affirm his conviction.

¶ 30    A criminal conviction may be based solely on circumstantial evidence. *Brown*, 2013 IL 114196, ¶ 49; *People v. Wheeler*, 226 Ill. 2d 92, 120 (2007). Circumstantial evidence is proof of facts and circumstances from which the trier of fact may infer other facts which reasonably and usually follow according to common experience. *People v. McPeak*, 399 Ill. App. 3d 799, 801 (2010). "In determining the reasonableness of an inference, the trier of fact need not look for all possible explanations consistent with innocence or 'be satisfied beyond a reasonable doubt as to

each link in the chain of circumstances.' " *In re Nasie M.*, 2015 IL App (1st) 151678, ¶ 24 (quoting *Wheeler*, 226 Ill. 2d at 117). It is sufficient if all of the evidence taken together satisfies the trier of fact of the defendant's guilt beyond a reasonable doubt. *People v. Hall*, 194 Ill. 2d 305, 330 (2000). The trier of fact need not disregard the inferences that flow normally from the evidence before it. *People v. Patterson*, 217 Ill. 2d 407, 435 (2005). Moreover, we "must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 31 In this case, the State was required to prove defendant secretly confined D.C. against his will. 720 ILCS 5/10-1(a)(1) (West 2016). As noted, confinement of a child under the age of 13 years is against that child's will if the confinement is without the consent of the child's parent or legal guardian. 720 ILCS 5/10-1(b) (West 2016). Here, viewing the evidence in the light most favorable to the State, we conclude the State presented sufficient circumstantial evidence to support a reasonable inference that defendant knew Maribel did not consent to him confining D.C. in the basement. See *Jackson*, 232 Ill. 2d at 280; *McPeak*, 399 Ill. App. 3d at 801. The record reveals Maribel asked Rodriguez—not defendant—to babysit D.C., and Rodriguez—not defendant—agreed to do so. Defendant acknowledged this fact when he testified "my wife took care of [D.C. and E.C.] on Saturdays and Sundays because [Maribel] had asked her. They both had come to an agreement." The record further reveals that (1) Maribel had never met defendant, and (2) defendant had no contact with D.C. prior to October 12, 2013. Importantly, the evidence additionally established defendant admitted to Detective Velma and Officer Carrasco that while in the basement "he didn't bite [D.C.] hard because he knew [D.C.] would cry and draw attention to his wife and mother-in-law." Based on these facts, particularly evidence that defendant did not want to draw attention to his presence in the basement with D.C.,

the trial court could reasonably infer defendant knew he did not have Maribel's consent to confine D.C. See *Patterson*, 217 Ill. 2d at 435; *McPeak*, 399 Ill. App. 3d at 801. The evidence therefore was not so improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt despite the fact that Maribel did not specifically testify that she did not consent to defendant confining D.C. in defendant's basement. See *id*; *Siguenza-Brito*, 235 Ill. 2d at 225; 720 ILCS 5/10-1(a)(1), 10-1(b), 10-2(a)(2) (West 2016). Accordingly, we affirm defendant's conviction for aggravated kidnapping. See *id.*

¶ 32                                  B. Fees

¶ 33    Defendant argues the trial court's assessment of fines, fees, and costs improperly included a $5 electronic citation fee. In his reply brief, defendant requests that we remand the matter to allow him to file a motion pursuant to Illinois Supreme Court Rule 472(e) (eff. May 17, 2019).[2] Rule 472(e) provides that, " '[i]n all criminal cases pending on appeal as of March 1, 2019, or appeals filed thereafter in which a party has attempted to raise sentencing errors' regarding the imposition or calculation of fines, fees, assessments or costs 'for the first time on appeal, the reviewing court shall remand to the circuit court to allow the party to file a motion' regarding such fines, fees, assessments or costs." *People v. Sanders*, 2019 IL App (1st) 160718, ¶ 53 (quoting Ill. S. Ct. R. 472(e) (eff. May 17, 2019)). The rule further provides that "the circuit court retains jurisdiction to correct" any alleged errors regarding the imposition of fines and fees "at any time following judgment and after notice to the parties." Ill. S. Ct. R. 472(a) (eff. May 17, 2019). Here, defendant's appeal was pending on appeal as of March 1, 2019. See *Sanders*, 2019 IL App (1st) 160718, ¶ 53; Ill. S. Ct. R. 472(e) (eff. May 17, 2019). Accordingly, we remand to the trial court for further proceedings consistent with Rule 472. See *Sanders*, 2019 IL

---

[2] Defendant filed his opening brief before our supreme court adopted Rule 472(e). The State agrees that the matter should be remanded for further proceedings pursuant to Rule 472.

App (1st) 160718, ¶ 53; Ill. S. Ct. R. 472 (eff. May 17, 2019).

¶ 34                                    III.  CONCLUSION

¶ 35    For the reasons stated above, we affirm defendant's conviction for aggravated kidnapping

and remand for further proceedings consistent with Rule 472 (eff. May 17, 2019).

¶ 36    Affirmed in part and remanded for further proceedings.