**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 210596-U

Order filed May 23, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| *In re* Em.E., | ) | Appeal from the Circuit Court |
| | ) | of the 14th Judicial Circuit, |
| a Minor | ) | Whiteside County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-21-0596 |
| | ) | Circuit No. 17-JA-18 |
| v. | ) | |
| | ) | |
| Lisa J., | ) | The Honorable |
| | ) | Patricia Ann Senneff, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE DAUGHERITY delivered the judgment of the court.
Justices McDade and Schmidt concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*: In an appeal in a termination of parental rights case, the appellate court held that: (1) the trial court's determination of parental unfitness was not against the manifest weight of the evidence; and (2) the biological mother (respondent) was not deprived of effective assistance of counsel at the parental fitness hearing. The appellate court, therefore, affirmed the trial court's judgment, terminating the biological mother's parental rights to her minor child.

¶ 2    In the context of a juvenile-neglect proceeding, the State filed petitions to involuntarily terminate the parental rights of respondent mother, Lisa J., to her minor children, Et.E., Em.E., and El.E.  After hearings on the matter, the trial court found that respondent was an unfit parent/person and that it was in the children's best interest to terminate respondent's parental rights.  Respondent appeals, arguing that: (1) the trial court erred in finding that she was an unfit parent/person; and (2) she was deprived of effective assistance of counsel at the parental fitness hearing.[1]  We affirm the trial court's judgment.

¶ 3                           I. BACKGROUND

¶ 4    Respondent was the biological mother of the minor children, Et.E. (born in October 2012), Em.E. (born in August 2013), and El.E. (born in September 2014).  Ryan E. (Ryan) was the biological father of the children.  In January 2017, the family came to the attention of the Department of Children and Family Services (DCFS) after DCFS received a hotline report that respondent and Ryan (referred to collectively at times as the parents) were methamphetamine (meth) users and were frequently in and out of jail, that the children were left with random individuals, and that items of drug paraphernalia were in the home and accessible to the children.

¶ 5    After receiving the report, DCFS sent an investigator to the family's home.  Respondent and the children were present in the home at the time.  Ryan was in jail.  Respondent told the investigator that she and Ryan had been using meth two to three times per week for the past three years, but denied that she had used illegal drugs in the home.  The investigator walked through the garage and found items that appeared to be drug paraphernalia.

_____

[1] Respondent also challenges the trial court's best interest determination.  Her challenge in that regard, however, is based solely upon her claim that the trial court's finding of parental unfitness was erroneous.

¶ 6    DCFS did not take protective custody of the children at that time. Instead, DCFS put in place an in-home safety plan and referred the family for intact services. During the next few months, respondent and Ryan did not complete substance abuse assessments, refused protective daycare for the minors, and tested positive at times for drugs. In addition, respondent did not cooperate with the supervision terms of the safety plan.

¶ 7    In March 2017, DCFS took protective custody of the children after it learned through a second hotline report that the children had been left with an unapproved caregiver—a person who had an outstanding warrant in existence for his arrest—and that respondent's whereabouts were unknown. Ryan was still in jail at that time. A few days later, the State filed a juvenile petition in each of the children's cases, alleging that the children were neglected minors because they had been subjected to an injurious environment. Respondent was given a court-appointed attorney to represent her in the juvenile court proceedings.

¶ 8    On November 14, 2017, a pretrial conference was held in respondent's cases regarding her three children (referred to hereinafter as respondent's cases or the children's cases). Respondent was present in court in custody for the pretrial conference and was represented by her attorney. The parties entered into a written stipulation which set forth all of the prior facts of the children's cases as stated above. The trial court reserved its findings at that time and set the case for a dispositional hearing on the neglect petition.

¶ 9    The following month, on December 19, 2017, a dispositional hearing was held in respondent's cases. Respondent was present in court in custody and was represented by her attorney. At the conclusion of the hearing, the trial court found that all three children were neglected and that respondent was unfit, unable, or unwilling to care for the children. The trial court made the children wards of the court and named DCFS as the children's guardian. The

permanency goal was set at that time for the children to be returned home (presumably, within 12 months). The dispositional order also provided that respondent was required to complete certain tasks, including the following: (1) participate in services as recommended in the service plan; (2) establish appropriate housing approved by DCFS; (3) reside only with people who would cooperate with DCFS; (4) notify DCFS of any significant changes in her household, including changes in employment, phone number, or household composition; (5) participate in visits with the children in an appropriate manner; (6) engage in appropriate interactions and discussions with the children during those visits; (7) participate in a substance abuse assessment and follow any recommendations given by the treatment provider; (8) participate in and complete a parenting class and follow any recommendations that were given; (9) participate in a mental health assessment and follow any recommendations that were given; (10) cooperate with, and successfully participate in, DCFS's scheduled and unscheduled home visits; and (11) participate in random drug tests.

¶ 10　　　　Over the next three or four years (referred to at times as the postadjudication period), numerous permanency review hearings were held in this case. Prior to all or most of the hearings, the caseworker filed a court review report and a permanency review report with the trial court and also filed a copy of the most recent service plan. After all or most of the hearings took place, the trial court entered a court review order and a permanency review order. Two of the court review orders that were entered during that postadjudication period were filed on December 9, 2019, and May 14, 2020. Those order again set forth the tasks that respondent was required to complete as had been noted previously at the time of disposition on the original neglect petitions. For many of the permanency review hearings, the trial court's orders indicated

4

that respondent was either not present in court for the hearings or that she was in custody for various criminal matters when the hearings took place.

¶ 11        In December 2020, the State filed petitions to terminate respondent's parental rights as to all three children.[2]  In the petitions, the State alleged that respondent was an unfit parent/person as defined in the Adoption Act because: (1) she had failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (see 750 ILCS 50/1(D)(b) (West 2020)); (2) she had failed to make reasonable progress toward the return home of the children during any nine-month period after the end of the initial nine-month period following the adjudication of neglect (see 750 ILCS 50/1(D)(m)(ii) (West 2020)); and (3) she had failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children during any nine-month period after the end of the initial nine-month period following the adjudication of neglect (see 750 ILCS 50/1(D)(m)(i) (West 2020)).[3]  The petitions specified the same nine-month period as to both the second and third grounds: August 6, 2019, through May 6, 2020.

¶ 12        In November 2021, an evidentiary hearing was held on the parental fitness portion of the termination petitions.  Respondent was present in court for the hearing in the custody of the Department of Corrections (DOC) and was represented by her appointed attorney.  At the outset of the hearing, the State asked the trial court to take judicial notice of certain documents in the court files.  The following conversation ensued.

---

[2] The State also sought to terminate the parental rights of Ryan.

[3] It appears that some of the language in the grounds portion of the State's petition was actually from a prior version of the applicable statute.

"[ASSISTANT STATE'S ATTORNEY]: First, Your Honor, I would ask the Court to take judicial notice of the files 17 JA 17, 18 and 19. Particularly the stipulation filed on November 14th of 2017, the orders of adjudication [and] disposition on December 28th, 2017, prior court orders of December 9th, 2019, and May 14th of 2020.

The order finding Ryan [E.] the father of all minors, it was filed on September 14th of 2021.

As well as the mother's lack of attendance before the, or during the duration of the case as well as father's.

THE COURT: The Court will take judicial notice of its own records in those files."

Respondent's attorney did not make any comment or objection to the State's judicial-notice request.

¶ 13 During the State's portion of the hearing, the assistant state's attorney called the placement worker,[4] Dawn Bliefnick, to testify as the State's only witness. Bliefnick testified that she was the placement worker for the children cases from March 2017 (when the children's cases first became placement cases) until August 2020. According to Bliefnick, DCFS first became involved with the children after the parents had been arrested and methamphetamine had been found in the home. The children's cases were initially intact cases but became placement cases when DCFS took protective custody of the children after the parents left the children with unapproved people.

---

[4] Bliefnick was referred to at some points during the hearing as the caseworker and at other points during the hearing as the placement worker. For the sake of consistency, we will refer to Bliefnick as the caseworker here.

¶ 14    As a placement worker, Bliefnick's responsibilities were to meet with the parties involved (the children and the parents) and to come up with a service plan for the parents to complete in order to work toward reunification. Bliefnick would try to go over the service plans with the parents in person, if the parents were available. In this particular case, respondent's availability to do so was sporadic throughout the entire duration of the children's cases. Most of the time, Bliefnick was not able to go over the service plans with the parents in person because the location of the parents was unknown. Bliefnick would often mail the service plans to respondent. Sometimes respondent would send the service plans back to Bliefnick (presumably after reviewing and signing them); other times, respondent would not do so. If the parents were in jail or in prison, Bliefnick would mail the service plans to the facility and would offer to let the parents participate in the administrative case review by phone. At that time, Bliefnick would go over the service plans with the parents.

¶ 15    Part of Bliefnick's job as the placement worker was to monitor the progress of the parents, and Bliefnick was familiar with the court review orders that were filed in the children's cases on November 26, 2019, and on May 5, 2020. When asked about respondent's progress on each of the required tasks, Bliefnick testified that: (1) respondent never participated in services throughout the children's cases; (2) during the course of the children's cases, respondent was able to establish appropriate housing for one period that was about a year and a half long when respondent was paroled from prison to her father's home and was living with her father, which was toward the end of the time period that Bliefnick was the placement worker for the children's cases; (3) respondent did not notify DCFS of any changes to her household; (4) initially when the cases were opened, respondent did not have visits with the children for nearly two years because DCFS did not know respondent's location; (5) respondent did have visits with the children after

7

she got out of prison and was living with her father; (6) during the relevant nine-month period specified in the termination petition (August 6, 2019, to May 6, 2020), respondent had monthly visits with her children and interacted appropriately with the children during those visits; (7) respondent did not complete a substance abuse assessment or any substance abuse treatment during the relevant nine-month period or during the entire time that Bliefnick was the placement worker for the children's cases; (8) respondent did not participate in parenting classes at any time during the nine-month period or during the entire time that Bliefnick was the placement worker; (9) respondent did not complete a mental health assessment or any mental health treatment during the relevant nine-month period or during the entire time that Bliefnick was the placement worker; (10) respondent cooperated with, and participated in, DCFS's scheduled and unscheduled home visits but only for the period when she was living with her father; (11) respondent failed to be present for the last home visit that Bliefnick had scheduled at respondent's father's home; (12) respondent did not participate in random drug tests during the relevant nine-month period, even though she was out of custody during that time period and was living with her father, and only completed one non-observed drug test throughout the entire time that Bliefnick was the placement worker; (13) respondent complied with the DCFS requirement that she reside only in an approved placement and with a cooperative person during the time period that she was living with her father; (14) during the course of the children's cases, Bliefnick would try to contact respondent on at least a monthly basis but would not often receive a response; (15) at some point, respondent expressed responsibility to Bliefnick for the children being in DCFS care and told Bliefnick that her children were better off where they were and that she had a problem with addiction; and (16) the only time throughout the duration of the

8

children's cases that Bliefnick was able to have regular contact with respondent was when respondent was in custody.

¶ 16    After the State's questioning was finished, respondent's attorney was given the opportunity to cross-examine Bliefnick but indicated to the trial court that he had no questions for the witness. The State called no further witnesses, presented no further evidence, and rested its case. Respondent's attorney called no witnesses to testify on respondent's behalf and presented no evidence. Respondent's attorney later made his closing argument. The following was stated:

> [RESPONDENT'S ATTORNEY]: Your Honor, based on the—I will argue that in the nine-month period that the State presents, my client did in fact make interest or have interest in the children. As stated by the caseworker's testimony, uhm, she was doing visits during the period. Although minimal, it did show that she did not abandon her children.
>
> I would add that also since being in D.O.C. my client has started doing other treatment services. She acknowledges—
>
> THE COURT: How do I know that?
>
> [RESPONDENT'S ATTORNEY]: What?
>
> THE COURT: How do I know that?
>
> [GUARDIAN *AD LITEM*]: Your Honor, I don't mean to interrupt. I'm going to object to that argument. He is arguing facts not in evidence.
>
> THE COURT: And that's what I was getting at.
>
> [RESPONDENT'S ATTORNEY]: Well considering we are considering the nine-month period and not now, I am done. I will rest.

9

THE COURT: I haven't heard any evidence about any of her efforts currently.

Now, I do acknowledge that I was asked to take judicial notice of 17 JA 17, 18 and 19. So, I mean technically anything that is contained in the reports about your client's participation in services would be noticed by the Court.

[RESPONDENT'S ATTORNEY]: Yes, Your Honor.

THE COURT: All right.

Anything else that you would like to argue?

[RESPONDENT'S ATTORNEY]: Uhm, the only other thing is that my client will be released from [DOC] soon and she would like a second chance."

¶ 17    After all of the evidence and arguments had been presented in the parental fitness hearing, the trial court found that all three grounds of parental unfitness had been proven by the State by clear and convincing evidence. The trial court concluded, therefore, that respondent was an unfit parent/person. In reaching that conclusion, the trial court commented that as to respondent's interest, concern, or responsibility for the welfare of the children, during the entire time period that the children had been under the court's jurisdiction, there were times when respondent participated in services, had contact with DCFS, and did some things—including visits with the children—that would lead the court to believe that respondent cared about the children, but that respondent's sporadic efforts in that regard were not sufficient for the court to find that the State had not met its burden.[5] The trial court noted that the children's cases had been going on since 2017; that respondent was no closer to completing the services that had been

_____

[5] For the sake of simplicity, we have presented the trial court's comments here as referring to respondent. At the hearing, however, most of the trial court's comments were made as to both of the parents collectively, rather than as to respondent individually.

ordered continually in this matter; and that respondent had gone for almost two years, at one point, without having visited with the children. The trial court noted further that respondent's contact with DCFS and participation in home visits were sporadic; that respondent did "little to nothing" to complete any of the services, including substance abuse treatment, parenting classes, mental health treatment, or random drug tests; and that even if the court wanted to return the children to respondent that day, it could not because respondent was incarcerated.

¶ 18     With regard to whether respondent had made reasonable progress during the relevant nine-month period, the trial court stated that the placement worker's testimony indicated that during the period in question, respondent did not complete services or even participate in most services. The trial court noted that respondent did not keep in contact with the placement worker or with DCFS; was sporadic in her visits and did not visit with the children for nearly a two-year period; did not engage in substance abuse treatment, parenting classes, or mental health treatment; and completed only one random drug test.

¶ 19     Finally, as to whether respondent made reasonable efforts during the relevant nine-month period, the trial court reiterated the same comments that it had made previously. The trial court noted that respondent was no closer to a return home of the children at the current time than she was when the cases began and that she was not close to a return home of the children during the relevant nine-month period.

¶ 20     A separate best interest hearing was held immediately thereafter. During the hearing, the State called the current caseworker, April Queckoerner, to testify about the statutory best interest factors as they pertained to the children's cases. The State also called one of the foster parents to provide further testimony relative to the best interest factors. No other evidence was presented. Respondent's attorney did not cross-examine either of the State's witnesses and did not present

11

any evidence on respondent's behalf, but did make the following closing argument as to the best interests of the children:

> "Your Honor, I would argue that the kids should be, or the biological mother, the biological mother, uhm, has certain ties to her children. As such I believe that the best place for the children would be with the biological mother when she is capable of having them."

¶ 21　　After considering the evidence and arguments, the trial court found by a preponderance of the evidence that termination of respondent's parental rights was in the best interest of the children. In so finding, the trial court noted, among other things, that the children had been in a happy, healthy, and stable environment for the past four years and that respondent had chosen, for whatever reason, during that time period not to do what was in the children's best interests.[6] The trial court terminated respondent's parental rights to the children, set the children's permanency goal to adoption, and named DCFS as the guardian of the children with the right to consent to adoption.[7] Respondent appealed.[8]

¶ 22　　　　　　　　　　　　　　II. ANALYSIS

¶ 23　　　　　　　　　　　　A. Parental Unfitness

¶ 24　　As her first point of contention on appeal, respondent argues that the trial court erred in finding her to be an unfit parent/person. More specifically, respondent asserts that the State

---

[6] As noted previously with the parental fitness hearing, for the sake of simplicity, we have presented the trial court's comments here as referring to respondent. At the hearing, however, most of the trial court's comments were made as to both of the parents collectively, rather than as to respondent individually.

[7] The trial court also terminated the parental rights of Ryan, the biological father.

[8] A separate appeal was filed as to each child.

12

failed to sufficiently prove any one of the three alleged grounds of parental unfitness and that the trial court's conclusion to the contrary was against the manifest weight of the evidence. We focus solely upon the allegation that respondent failed to maintain a reasonable degree of interest, concern, or responsibility toward the children's welfare since it is dispositive of our issue here. As to that allegation, respondent asserts that the testimony of the State's only witness, the placement worker, showed that respondent complied with the majority of the court's orders (the required tasks) and that respondent made significant progress since the beginning of the children's cases. According to respondent, the evidence presented at the hearing established that over the duration of the children's cases, respondent had gone from using meth two to three times per week, having drug paraphernalia in the house, leaving the children with inadequate care, and being in and out of jail to having appropriate housing, cooperating with visits, having appropriate interaction with the children, residing with appropriate people, and completing one random drug test. Thus, respondent contends that the State's own witness confirmed that respondent had maintained a reasonable degree of interest, concern, or responsibility as to the children's welfare for the duration of the children's cases. Respondent asks, therefore, that we reverse the trial court's finding of parental unfitness and that we remand this case for further proceedings. Respondent also asks that we reverse the trial court's best interest determination as well because that determination cannot stand without a finding of parental unfitness. See *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 88 (indicating that the trial court will not go on to conduct a best interest hearing unless it finds that the parents are unfit).

¶ 25       The State argues that the trial court's finding of parental unfitness was proper and should be upheld. In making that argument, the State points out that in addition to the testimony of the placement worker, the trial court also had before it at the parental fitness hearing certain orders,

13

of which the trial court took judicial notice, from the court files in the children's cases. The State asserts that the evidence presented and the judicially-noticed court orders strongly supported the trial court's finding of parental unfitness on all three grounds alleged in the petitions. The State contends, therefore, that the trial court's finding of parental unfitness was not against the manifest weight of the evidence and asks that we affirm both that finding and the trial court's best interest determination.

¶ 26    The involuntary termination of parental rights is governed by the provisions of both the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). See *In re D.T.*, 212 Ill. 2d 347, 352 (2004). In the first stage of termination proceedings in the trial court, the State has the burden to prove the alleged ground of parental unfitness by clear and convincing evidence. See 705 ILCS 405/2-29(2) (West 2020); *In re C.W.*, 199 Ill. 2d 198, 210 (2002). The proof of any single statutory ground will suffice. 750 ILCS 50/1(D) (West 2020); *C.W.*, 199 Ill. 2d at 210. A trial court's finding of parental unfitness is given great deference and will not be reversed on appeal unless it is against the manifest weight of the evidence; that is, unless it is clearly apparent from the record that the trial court should have reached the opposite conclusion or that the conclusion itself is unreasonable, arbitrary, or not based on the evidence presented. *In re C.N.*, 196 Ill. 2d 181, 208 (2001); *In re A.M.*, 358 Ill. App. 3d 247, 252-53 (2005); *In re Tiffany M.*, 353 Ill. App. 3d 883, 889-90 (2004).

¶ 27    Under section 1(D)(b) of the Adoption Act, a parent may be found unfit if he or she fails to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare. 750 ILCS 50/1(D)(b) (West 2020). Because the language of the statute is written in the disjunctive, any one of the three grounds listed—interest or concern or responsibility—may by

itself constitute a basis for unfitness. 750 ILCS 50/1(D)(b) (West 2020); *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. In determining whether a parent has shown a reasonable degree of interest, concern, or responsibility for a child's welfare, the trial court will consider the parent's efforts to visit and maintain contact with the child, along with other indicia, such as inquiries into the child's welfare. *B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31. Whether the parent has completed service plans may also be considered as evidence of a parent's interest, concern, or responsibility. *Id.* In making its determination, the trial court must focus on a parent's efforts, not on whether the parent's efforts were successful. *Id.* In addition, the trial court must examine the parent's conduct with regard to the child in the context of the circumstances in which that conduct occurred. *Id.* Thus, problems that the parent faces, such as difficulty in obtaining transportation, poverty, actions and statements of others that hinder visitation, and the need to resolve other life issues, are relevant. *Id.* It must be remembered, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child. *Id.* On the contrary, the interest, concern, or responsibility must be objectively reasonable. *Id.* In determining whether a parent has failed to maintain a reasonable degree of interest, concern or responsibility for a child, the trial court will consider the parent's conduct during the entire postadjudication period, not just the parent's conduct during the service plan. See *In re Jason U.*, 214 Ill. App. 3d 545, 552 (1991).

¶ 28 After having reviewed the record in the present case, we find that the trial court's determination—that respondent was an unfit parent/person because she had failed to maintain a reasonable degree of interest, concern, or responsibility for the welfare of the children—was well supported by the evidence. As Bliefnick's testimony indicated, during the entire postadjudication period, respondent failed to complete, or even participate in, many of the

15

services that were required by DCFS and the trial court. Although respondent (and Ryan's) drug addiction was the main problem that brought the family to the attention of DCFS, during the entire postadjudication period, respondent failed to obtain a substance abuse assessment, failed to participate in or complete any treatment, and failed to participate in all but one of her random drug tests. During the entire postadjudication period, respondent also failed to obtain a mental health assessment, failed to participate in or complete any mental health treatment, and failed to participate in or complete parenting classes. In addition, respondent maintained a stable residence for only a portion of the postadjudication period—the year and a half that she lived in her father's house with her father. Other than during that time period, respondent was in jail or prison or her whereabouts were unknown. In addition, respondent's contact with DCFS and her placement worker was sporadic throughout the postadjudication period, despite repeated efforts by the placement worker to remain in contact with respondent, and although respondent visited the children for the period of time when she lived with her father, she had another period of nearly two years when she did not visit with her children at all. Based upon the evidence presented, we conclude that the trial court's finding of parental unfitness as to the first ground alleged in the petitions (respondent's failure to maintain a reasonable degree of interest, concern, or responsibility for the children's welfare) was not against the manifest weight of the evidence. See 750 ILCS 50/1(D)(b) (West 2020); *C.N.*, 196 Ill. 2d at 208; *A.M.*, 358 Ill. App. 3d at 252-53; *Tiffany M.*, 353 Ill. App. 3d at 889-90. We need not, therefore, consider the other two grounds of parental unfitness alleged in the petitions, as a single ground is sufficient to support the trial court's finding. See 750 ILCS 50/1(D) (West 2020); *C.W.*, 199 Ill. 2d at 210. Accordingly, we affirm the trial court's finding of parental unfitness.

16

¶ 29    Having concluded that the trial court's parental unfitness determination was proper, we also deny respondent's request to have this court reverse the trial court's best interest determination since respondent's request in that regard was based solely upon her allegation that the trial court's finding of parental unfitness was erroneous.

¶ 30                         B. Ineffective Assistance of Counsel

¶ 31    As her second point of contention on appeal, respondent argues that she was deprived of effective assistance of counsel at the parental fitness hearing. More specifically, respondent asserts that her attorney's performance was deficient when her attorney: (1) failed to object to or to clarify the State's request to have the trial court take judicial notice of the court files; (2) failed to cross-examine the State's only witness when there was evidence upon which to do so; (3) failed to call any witnesses to testify in respondent's behalf; and (4) made only a brief closing argument to the trial court. Respondent asserts further that she was prejudiced by her attorney's deficient performance in that but for those deficiencies, the result of the parental fitness hearing would have been different. Respondent asks, therefore, that we reverse the trial court's judgment and that we remand this case for a new parental fitness hearing with competent counsel assigned.

¶ 32    The State argues that respondent was not deprived of effective assistance of counsel at the parental fitness hearing and that the trial court's judgment should be upheld. According to the State, the actions of trial counsel about which respondent complains were matters of trial strategy, were not a deficiency, or would have resulted in more negative information being elicited about respondent. Thus, the State contends that the performance of respondent's attorney was not deficient. In addition, the State maintains, even if respondent's attorney's performance was deficient, respondent was not prejudiced by that deficiency because the

17

evidence of respondent's parental unfitness as to all three grounds was overwhelming. The State asks, therefore, that we affirm the trial court's judgment.

¶ 33        An issue of ineffective assistance of counsel presents the reviewing court with a mixed question of fact and law. *People v. Davis*, 353 Ill. App. 3d 790, 794 (2004). To the extent that the trial court's findings of fact bear upon the determination of whether counsel was ineffective, those findings must be given deference on appeal and will not be reversed unless they are against the manifest weight of the evidence. See *id*. However, the ultimate question of whether counsel's actions support a claim of ineffective assistance is a question of law that is subject to *de novo* review on appeal. See *id.*

¶ 34        A claim of ineffective assistance of counsel is analyzed under the two-pronged, performance-prejudice test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). To prevail on a claim of ineffective assistance of counsel, a defendant (or a respondent, as in this case) must show that: (1) defense counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant to the extent that he was deprived of a fair proceeding. *Id*. More specifically, a defendant must show that defense counsel's performance was objectively unreasonable when compared to prevailing professional norms and that there is a reasonable probability that, but for defense counsel's unprofessional errors (deficient performance), the result of the proceeding would have been different. *People v. Veach*, 2017 IL 120649, ¶ 30. A reasonable probability is one sufficient to undermine confidence in the outcome of the proceeding. *Id.* A defendant's failure to satisfy either prong of the *Strickland* test prevents a finding of ineffective assistance of counsel. *Patterson*, 217 Ill. 2d at 438.

¶ 35    After reviewing the record of the parental fitness hearing in the present case, we find that respondent's claim of ineffective assistance of counsel cannot be maintained. Even if we assume that the actions or inactions of respondent's attorney constituted deficient performance, we would still have to reject respondent's assertion of ineffective assistance of counsel because the evidence of respondent's parental unfitness in this case was overwhelming. See *id.* (indicating that a defendant's failure to satisfy either the deficient performance prong or the prejudice prong of the *Strickland* test prevents a finding of ineffective assistance of counsel). As noted above, during the postadjudication period, respondent failed to complete or participate in many of the required services, even those targeted at respondent's drug addiction, the main reason that respondent's family came to the attention of DCFS in the first place. We, therefore, conclude that the result of the parental fitness hearing would not have been different if respondent's attorney had taken the actions that respondent believes should have been taken and that respondent suffered no prejudice as the result of any alleged deficient performance on the part of her attorney. See *Veach*, 2017 IL 120649, ¶ 30 (indicating that to establish the prejudice prong of the *Strickland* test, a defendant must show that a reasonable probability exists that, but for defense counsel's deficient performance, the result of the proceeding would have been different).

¶ 36                                III. CONCLUSION

¶ 37    For the foregoing reasons, we affirm the judgment of the circuit court of Whiteside County.

¶ 38    Affirmed.

19